Filed 9/12/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B287946 |
| Petitioner, | (Los Angeles County |
| | Super. Ct. No. ZM004075) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| GEORGE VASQUEZ, | |
| Real Party in Interest. | |

  ORIGINAL PROCEEDING; petition for writ of mandate. James Bianco, Judge.  Petition denied.

  Jackie Lacey, District Attorney, Margo Baxter, Head Deputy District Attorney, Roberta Schwartz and June Chung, Deputy District Attorneys, for Petitioner.

  No Appearance for Respondent.

Law Office of Robert S. Gerstein, Robert S. Gerstein; Law Offices of Mark Brandt and Mark P. Brandt for Real Party in Interest.

_____

In 1995 George Vasquez was convicted of four counts of committing lewd or lascivious acts on a child under 14 years of age (Pen. Code, § 288, subd. (a)), and was sentenced to 12 years in state prison.  Prior to Vasquez's release, on September 7, 2000 the People filed a petition to commit Vasquez as a sexually violent predator (SVP) under the Sexually Violent Predator Act (SVPA; Welf. & Inst. Code, § 6600 et seq.).[1]  Vasquez was detained in state hospitals for over 17 years awaiting trial on the petition, as a series of six appointed attorneys slowly moved his case toward trial.

Fourteen years into Vasquez's confinement, the public defender's office suffered a 50 percent cut to its attorney staffing and the loss of paralegals, which further slowed down Vasquez's third deputy public defender in her preparation for trial.  After two more years of sluggish progress, this attorney was transferred out of the SVP unit just months before Vasquez's January 2017 trial date.  After Vasquez's fifth attorney requested yet another continuance to prepare for trial, Vasquez objected, declaring, "Enough is enough."  At this point—16 years after the petition was filed—the trial court granted Vasquez's motion to relieve the public defender's office as his counsel and appointed a bar panel attorney to represent Vasquez.

---

[1]     Unless otherwise specified, all statutory references are to the Welfare and Institutions Code.

Eight months later Vasquez's new attorney filed a motion to dismiss the petition for violation of Vasquez's due process right to a speedy trial. By then no new trial date had been set. After the trial court granted Vasquez's motion to dismiss and ordered that Vasquez be released, the People filed this petition requesting that we vacate the order and direct the trial court to set the petition for trial. We stayed the trial court's order releasing Vasquez pending our review of the petition.

We consider under what circumstances a 17-year delay in bringing to trial an SVPA petition violates an individual's Fourteenth Amendment due process right to a timely trial. We conclude that while a substantial portion of the delay here resulted from the failure of individual appointed attorneys to move Vasquez's case forward, the extraordinary length of the delay resulted from "a systemic 'breakdown in the public defender system,'" and must be attributed to the state. (*Vermont v. Brillon* (2009) 556 U.S. 81, 85, 94 (*Brillon*).) This breakdown forced Vasquez to choose between having prepared counsel and a timely trial. Yet under our Constitution he had a right to both. We conclude the trial court did not err in finding that Vasquez's due process right to a timely trial was violated. We deny the petition.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.  *The SVPA*

"The SVPA authorizes the involuntary civil commitment of a person who has completed a prison term but is found to be [an SVP]." (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 344 (*State Dept. of State Hospitals*) [discussing the SVPA provisions in effect as of 2007]; accord, *Reilly v. Superior*

*Court* (2013) 57 Cal.4th 641, 646 (*Reilly*) [same].)[2] At the time the SVPA petition was filed in this case, former section 6600, subdivision (a), defined an SVP as "a person who has been convicted of a sexually violent offense against two or more victims for which he or she received a determinate sentence and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior."[3] The SVPA is

---

[2] Because the SVPA petition was filed in 2000, we refer to the former SVPA provisions in effect in 2000 and will note where those provisions are materially different from the current provisions. The SVPA was amended by Proposition 83, approved by the voters on November 7, 2006. (See *State Dept. of State Hospitals*, *supra*, 61 Cal.4th at p. 344, fn. 3.) The most significant change made as part of the 2006 amendment was to replace the two-year commitment term under former section 6604 with an indeterminate term of commitment. (See § 6604; *People v. McKee* (2010) 47 Cal.4th 1172, 1186 ["Proposition 83 also changes an SVP commitment from a two-year term to an indefinite commitment."].) Further, in 2005 the Department of Corrections was renamed the Department of Corrections and Rehabilitation. (Gov. Code, § 12838.5; Stats. 2005, ch. 10, § 6.) In addition, the former State Department of Mental Health (DMH) was renamed the State Department of State Hospitals (SDSH). (*Reilly*, *supra*, 57 Cal.4th at p. 647.) We refer to the agencies by their former names for simplicity. The post-2000 amendments to the SVPA do not change our due process analysis. (See *State Dept. of State Hospitals*, at pp. 344, fn. 3, 356-357 [post-2006 amendments to SVPA were not material to the court's analysis of whether DMH's failure to designate two evaluators to assess the inmate was a proximate cause of the inmate's commission of a murder after his release].)

[3] Section 6600, subdivision (a)(1), now requires that a person be convicted of a sexually violent offense against "one or more

---

intended ""to protect the public from dangerous felony offenders with mental disorders and to provide mental health treatment for their disorders."" (*State Dept. of State Hospitals*, *supra*, at p. 344.)

"Whenever the Director of Corrections determines that an individual who is in custody . . . may be [an SVP], the director shall . . . refer the person for evaluation . . . ." (Former § 6601, subd. (a)(1).) Once the Director of Corrections refers an inmate for screening, the Department of Corrections and Board of Prison Terms performs the screening "based on whether the person has committed a sexually violent predatory offense and on a review of the person's social, criminal, and institutional history. . . . If as a result of this screening it is determined that the person is likely to be [an SVP], the Department of Corrections shall refer the person to [DMH] for a full evaluation of whether the person [is an SVP]." (Former § 6601, subd. (b); see *State Dept. of State Hospitals*, *supra*, 61 Cal.4th at pp. 344-345.)

The evaluation of whether the inmate is an SVP is conducted by two mental health experts—psychologists or psychiatrists—appointed by the Director of the DMH, pursuant to a standardized assessment protocol developed and updated by

---

victims." Former section 6600, subdivision (b), defined a "'[s]exually violent offense'" as "the following acts when committed by force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person," including as one of the acts "a felony violation of . . . subdivision (a) or (b) of [Penal Code s]ection 288 . . . ." Both the former and the current versions of section 6600, subdivision (b), include a conviction for violating Penal Code section 288, subdivision (a), the crime for which Vasquez suffered a conviction.

the mental health agency.  (Former § 6601, subds. (c) & (d).)
"The standardized assessment protocol shall require assessment
of diagnosable mental disorders, as well as various factors known
to be associated with the risk of reoffense among sex offenders.
Risk factors to be considered shall include criminal and
psychosexual history, type, degree, and duration of sexual
deviance, and severity of mental disorder."  (Former § 6601, subd.
(c); see *State Dept. of State Hospitals*, *supra*, 61 Cal.4th at p. 345.)

The SVPA contains provisions for the evaluations to be
updated or replaced after the commitment petition is filed in
order "to obtain up-to-date evaluations, in light of the fact that
commitment under the SVPA is based on a 'current' mental
disorder.  [Citations.]  If an updated or replacement evaluation
results in a split of opinion as to whether the individual meets
the criteria for commitment, the [DMH] must obtain two
additional evaluations in accordance with subdivision (f) of
section 6601.  [Citation.]  However, although initial evaluations
conducted under section 6601 must agree, a lack of concurrence
between updated or replacement evaluations does not require
dismissal of the petition.  [Citation.]  Rather, the updated
evaluations' primary purpose is evidentiary or informational.
[Citation.]  Mandatory dismissal is not required where one or
both of the later evaluators conclude the individual does not meet
the criteria for commitment."  (*Reilly*, *supra*, 57 Cal.4th at
pp. 647-648.)

"'[A] petition to request commitment . . . shall only be filed
if both independent professionals . . . concur that the person
meets the criteria for commitment . . . .'  [Citation.]  When that
requirement is met, 'the Director of Mental Health shall forward
a request for a petition to be filed for commitment . . .' to the
designated counsel of the county.  [Citation.]  If counsel concurs

6

with the recommendation, 'a petition for commitment shall be filed in . . . superior court . . . .' [Citation.] The court thereafter 'shall review the petition and shall determine whether there is probable cause to believe that the individual . . . is likely to engage in sexually violent predatory criminal behavior upon his or her release.' [Citation.] The court must order a trial if there is probable cause, and it must dismiss the petition if there is not." (*State Dept. of State Hospitals*, *supra*, 61 Cal.4th at pp. 345-346.)

If the trial court makes a finding of probable cause, the alleged SVP is "entitled to a trial by jury, the assistance of counsel, the right to retain experts or professional persons to perform an examination on his or her behalf, and have access to all relevant medical and psychological records and reports. In the case of a person who is indigent, the court shall appoint counsel to assist him or her, and, upon the person's request, assist the person in obtaining an expert or professional person to perform an examination or participate in the trial on the person's behalf." (Former § 6603, subd. (a).) "A unanimous verdict shall be required in any jury trial." (Former § 6603, subd. (d).) Proof at trial that a person is an SVP must be beyond a reasonable doubt. (§ 6604.)

Once there is a finding of probable cause, the court "shall order that the person remain in custody in a secure facility until a trial is completed and shall order that a trial be conducted to determine whether the person is, by reason of a diagnosed mental disorder, a danger to the health and safety of others in that the person is likely to engage in acts of sexual violence upon his or her release from the jurisdiction of the Department of Corrections or other secure facility." (Former § 6602, subd. (a).)

7

B.  *The Petition and Expert Evaluations*

On September 7, 2000 the People filed a petition to commit Vasquez as an SVP upon his release from prison.  The petition was supported by evaluations from two psychologists, Dr. Craig A. Updegrove and Dr. Douglas R. Korpi.

The petition alleged that Vasquez was convicted of four counts of lewd or lascivious acts on a child under 14 years of age (Pen. Code, § 288, subd. (a)), which are sexually violent offenses within the meaning of section 6600, subdivisions (b) and (e), and that he was sentenced to a determinate term on June 28, 1995.[4] The petition alleged that Vasquez had a diagnosed mental disorder and posed a danger to the health and safety of others within the meaning of section 6600, subdivisions (c) through (e).

Dr. Updegrove concluded in his 2000 report in support of the petition that "Vasquez meets the criteria for a diagnosis of pedophilia," and "might meet the diagnostic criteria for an intellectual or learning disorder."  He opined that Vasquez "is likely to commit a new sexually violent crime as a result of his diagnosed mental disorder without appropriate treatment and custody."  Dr. Korpi in his 2000 report similarly diagnosed Vasquez with "Pedophilia, Attracted to Same Sex, Exclusive Type," and a learning disorder.  He opined Vasquez was likely to reoffend, noting "[p]erhaps most important in this regard is the fact that after his 1990 charge, he was ordered into treatment and, after three months, simply stopped attending.  Individuals

---

[4]     According to Dr. Updegrove's 2000 evaluation supporting the petition, over a seven-week period in 1994, Vasquez offered candy to at least five boys, ages five to eight, who lived in his neighborhood, if they would show him their penises.  After the boys complied, Vasquez forced them to orally copulate him.

8

who begin treatment and then drop out are, statistically speaking, at greater likelihood to sexually re-offend."

Since the filing of the petition, there have been 24 expert evaluations, all but one of which were positive, meaning they recommended commitment as an SVP. The one negative evaluation was completed by Dr. Korpi on February 10, 2017. Dr. Korpi found significant in this evaluation that Vasquez first became involved in a sex offender treatment program in September 2015. He concluded, "Accordingly, I am going to judge that he no longer meets criteria as a Sexually Violent Predator inasmuch as he no longer presents a serious, well-founded risk of sexually acting out." However, two subsequent evaluations performed by other doctors on March 23, 2017 and March 24, 2017 were positive.

C.    *Court Proceedings Following the Filing of the Petition*
    1.    *The First Seven Years: 2000 Through May 2007*
Deputy Public Defender Michael Suzuki represented Vasquez for the first seven years after the filing of the petition. Vasquez appeared at the first 16 court appearances, including at the probable cause hearing held on February 13, 2002. However, during the ensuing five-and-a-half years, Suzuki appeared on behalf of Vasquez 35 additional times, each time waiving Vasquez's appearance in court. As the trial court concluded, "[d]uring this time, it appears that little progress, if any, was made towards moving the case to trial."

Drs. Updegrove and Korpi both testified at the probable cause hearing. The trial court found probable cause to believe Vasquez was an SVP, and ordered him committed. On February 11, 2003 Vasquez filed a motion to vacate the commitment order pursuant to the standard of proof for a

9

probable cause hearing on an SVPA petition established by the Supreme Court in *Cooley v. Superior Court* (2002) 29 Cal.4th 228.[5]  On September 9, 2003 the trial court granted the motion. The court held a second probable cause hearing on September 9 and 11, 2003, at which Drs. Updegrove and Korpi again testified. The trial court found probable cause to believe Vasquez was an SVP.

From January 27, 2004 through the end of 2006 the pretrial hearing was continued 20 times; 13 of these were at the request of Vasquez's counsel; the remainder were by stipulation of counsel or order of the court.  At the February 14, 2007 pretrial hearing Suzuki announced that the public defender's office was "unavailable" for trial.[6]  At a continued hearing on May 30, 2007

---

[5]  The Supreme Court in *Cooley* concluded that a probable cause hearing under section 6602, subdivision (a), "requires the superior court to determine whether a reasonable person could entertain a strong suspicion that the petitioner has satisfied all the elements required for a civil commitment as an SVP . . . ." (*Cooley v. Superior Court*, *supra*, 29 Cal.4th at p. 236, italics omitted.)

[6]  The trial court found based on its review of the transcript of the hearing that the public defender's office declared itself unavailable under *In re Edward S.* (2009) 173 Cal.App.4th 387, in which the court concluded that a deputy public defender provided ineffective assistance of counsel by not requesting additional time to investigate a possible defense to a criminal charge against a juvenile due to the attorney's excessive workload.  (*Id*. at pp. 414-415.)  The court explained that the attorney had an obligation to raise his concern with his supervisor and, if no relief was provided, to file a motion with the trial court to withdraw from the case, so that the trial court could

Suzuki reported that his office had received funding, and was no longer unavailable.

### 2. *The Next Four-and-a-half Years: September 2007 Through May 2012*

On September 13, 2007 Deputy Public Defender Omar Hazel appeared as Vasquez's new counsel.  He represented Vasquez for the next four-and-a-half years.  During that period Hazel appeared on Vasquez's behalf 23 times, and all but one time waived Vasquez's appearance.[7]  During 2008 and 2009 there were eight continuances, either by stipulation of counsel or at the request of Vasquez's counsel.  During 2009 Drs. Updegrove and Korpi prepared new evaluation reports, both of which recommended commitment as an SVP.  In March 2009 the trial court set the first trial date for March 2010.

On May 5, 2010 Vasquez purportedly signed a waiver of appearance and speedy trial rights pursuant to *People v. Litmon* (2008) 162 Cal.App.4th 383, 399-406 (*Litmon*).  The copy of the waiver provided as an exhibit in the appellate record contains a signature that appears to be from Vasquez, but contains no file stamp indicating that it was filed with the court.  Further, the trial court in ruling on Vasquez's motion to dismiss noted that "there was [no] mention during court hearings of a written waiver signed by Mr. Vasquez.  It is unclear whether this was a waiver of Mr. Vasquez's right to be present in court, a waiver of his right

---

appoint private counsel at public expense to provide adequate representation.  (*Id*. at p. 414.)

[7]     The trial court found that Hazel waived Vasquez's appearance at all 23 court appearances, but the record reflects that Vasquez appeared by videoconference on January 3, 2012.

11

to a speedy trial, or both.  The court could not locate any such document in its files, and neither counsel produced such a document at the hearing on the motion.  The court gives no weight to the possible existence of a written speedy trial waiver."  Because the written waiver was not before the trial court, we do not consider the actual written waiver in our review of the writ petition.  (*People v. Jones* (2013) 57 Cal.4th 899, 922 ["In evaluating the correctness of a trial court's denial of a defendant's speedy trial motion, we consider all evidence that was before the court at the time the trial court ruled on the motion."]; *CRST, Inc. v. Superior Court* (2017) 11 Cal.App.5th 1255, 1275, fn. 17 ["our review of a writ petition is limited to the record before the trial court"].)[8]

In May 2010 Hazel filed a motion pursuant to *In re Ronje* (2009) 179 Cal.App.4th 509,[9] seeking to dismiss the case on the

---

[8]    The People contend the trial court should have considered the written waiver because both the deputy district attorneys and Vasquez's attorneys referred to the written waiver in court on several occasions and represented that Vasquez had waived time.  Given that the written waiver was not before the trial court, it did not abuse its discretion in failing to take into account the specific written waiver provided by Vasquez.  Moreover, even if we were to consider that Vasquez had provided some form of waiver of his speedy trial rights in 2010, this would not alter our analysis because we conclude the first 14 years of delay are attributable to Vasquez, regardless of whether he waived time for trial.

[9]    The court in *In re Ronje* concluded that "the assessment protocol used to evaluate" an SVP was "invalid as an underground regulation."  (*In re Ronje, supra*, 179 Cal.App.4th at p. 513.)  The court determined the appropriate remedy for use of the invalid protocol was "not to dismiss the SVPA commitment

---

basis that the assessment protocol used to determine whether Vasquez was an SVP was invalid.  On June 8, 2010 the trial court denied the motion to dismiss, but ordered Drs. Updegrove and Korpi to prepare new evaluations, and set a probable cause hearing for September 28, 2010.  Hazel represented that Vasquez had waived time for trial.  The probable cause hearing setting was continued multiple times to enable counsel to receive the updated evaluations.  On January 3, 2012 Vasquez was present when the trial court continued the probable cause hearing at Hazel's request to February 1, 2012; the hearing was later continued multiple times without Vasquez present, and ultimately was set for January 8, 2013.

### 3. *The Next Two Years: June 2012 Through July 2014*

In June 2012 Deputy Public Defender Terry Shenkman assumed representation of Vasquez.  She first appeared on his behalf on January 8, 2013.  On May 8, 2013 Shenkman filed a motion to remove and replace Drs. Updegrove and Korpi as evaluators.  At the June 4, 2013 hearing on Vasquez's motion, Shenkman argued that Drs. Updegrove and Korpi were biased and should be replaced.  The trial court denied the motion, finding no evidence of actual bias.  However, the court ordered the doctors to perform new evaluations.

---

petition, but to order new evaluations . . . using a valid assessment protocol and to conduct another probable cause hearing under section 6602, subdivision (a) based on those new evaluations." (*Id*. at p. 514.)  *In re Ronje* was later disapproved in part by *Reilly*, in which the Supreme Court held that an alleged SVP must prove the assessment protocol error was material to be entitled to new evaluations.  (*Reilly, supra*, 57 Cal.4th at p. 655.)

13

At this hearing, Shenkman requested time for the public defender's office appellate department to review the record and consider seeking a writ of mandate. At Shenkman's request, the trial court set the probable cause hearing for April 7 and 8, 2014. The deputy district attorney stated to Vasquez, "You understand that you have a right to have a speedy probable cause hearing, and we're putting this matter over for many, many months into April of 2014 at your attorney's request. Is that what you would like to do, sir?" Vasquez responded, "That would be fine." The court set a status hearing on the evaluations for July 23, 2013. The record reflects that Drs. Updegrove and Korpi prepared new evaluations in October 2013.

On May 20, 2014 Shenkman filed a motion for a new probable cause hearing under *Reilly*, *supra*, 57 Cal.4th 641.[10] At a hearing on June 13, 2014, the trial court denied the motion. On July 25, 2014 the deputy district attorney informed the court that Dr. Updegrove had retired, and Dr. Korpi's most recent evaluation would become stale in September.

4. *The Next Approximately Two Years: October 2014 Through August 2016*

At a hearing on October 27, 2014 counsel discussed the status of the expert evaluations. In response to the court's inquiry about the status of the evaluation by the defense expert,

---

[10]    Under *Reilly*, "if an alleged SVP can demonstrate that a material error occurred in the evaluative process, for the purposes of section 6601, both concurring evaluations are invalid and are rendered a legal nullity." (*Reilly*, *supra*, 57 Cal.4th at p. 655.) If the alleged SVP meets this burden, new evaluations must be prepared and the alleged SVP is entitled to a new probable cause hearing. (*Ibid*.)

Shenkman stated, with Vasquez present by videoconference, "Your Honor, I haven't had an opportunity to have a conference with the defense expert. I know he has worked on the case . . . . And as the court knows, my department staff has been reduced by 50 [percent] and the workload has increased, and I have explained that to Mr. Vasquez, who understands."

On December 8, 2014 the deputy district attorney informed the court she was still waiting for the updated evaluation from Dr. Korpi. The court inquired, "[O]nce we get Dr. Korpi's report, then what are the remaining steps before the case goes to trial?" Shenkman responded that she was entitled to take depositions and prepare further for trial. She added, "And I would just note that my office suffered a staff reduction of 50 percent of the lawyers. Then we suffered an additional reduction in the paralegals. And I have currently lost my paralegal and don't have a paralegal assigned on the case. [¶] So in addition to having my workload greatly increased, I also have cases in which I don't have assistance on, and I am currently engaged in two probable cause hearings, and I have a restoration of sanity hearing that's supposed to begin. So because of this workload, we will have to see in January when we have the reports what the lay of the land is. [¶] I have explained my situation to Mr. Vasquez, and Mr. Vasquez advised me he understood and he wants me to be prepared, and he is willing to give me whatever time that I need in order to prepare for his trial."

The court stated, "Here is what I am going to do, Ms. Shenkman. I am going to give you 90 days to conduct the depositions. Then we are going to have a trial. Okay? So let's get a date in about four months for trial. And if you can't get it done, then I am going to consider relieving your office. . . . You have had this case for 14 years. I understand that your office

15

made a decision to cut staff and to reassign cases. But 14 years is a very very long time. This case needs to move forward." The case was set for trial on April 27, 2015.

On January 26, 2015 the trial court considered Shenkman's written motion to continue the trial date, then set for April 27, 2015. Shenkman explained that she obtained a new paralegal on the case with a heavy workload, who had to "get acquainted with the case and establish a relationship with Mr. Vasquez." The deputy district attorney objected to a further continuance, noting the case was over 14 years old. Shenkman responded, "[The People] don't have a right to a speedy trial. Mr. Vasquez wants me to be prepared. And I know I will not be prepared by April 27th due to the amount of work that needs to be done, not only on this case but on other cases. And it's not as if I can drop work on all my other cases in order to focus on this." Shenkman added that in the prior 14 years Vasquez had three or four lawyers, each of whom had to become acquainted with the case. After hearing counsels' arguments, the trial court continued the pretrial conference to March 26, 2015.

At the March 26, 2015 hearing, the trial court considered another written motion to continue filed by Shenkman. Vasquez was present by videoconference. Shenkman stated, "Mr. Vasquez does not oppose the continuance. In fact, if the court denies the continuance and sends me out to trial, he does not want to be ordered out for the trial, and he does not want to come down to [Los Angeles] for a trial when his lawyer is not prepared." She added that if the court attempted to send her out to trial unprepared, her office would have to withdraw from the case. Further, "Mr. Vasquez doesn't want a new lawyer. He just wants his lawyer to have the opportunity to prepare his case, and I have explained to Mr. Vasquez what has happened in my office and

16

about the staff reductions and how that has affected our cases, and he understands it."

When Shenkman made clear she would not be ready for a July 2015 trial date, the deputy district attorney suggested the court replace the public defender's office, to which the trial court responded, "I don't think that the court can do that. I think I can send the case out for trial, and if counsel wants to withdraw, she can. But I don't think it would be appropriate for the court to remove court-appointed counsel." The court continued the motion to allow counsel to determine their experts' availability.

On April 22, 2015, based on the experts' availability for trial, the court granted Vasquez's written motion to continue the trial date to September 15, 2015. Vasquez was present by videoconference. However, the trial date was later continued multiple times, with Vasquez's agreement, then set for May 12, 2016.

On March 10, 2016 Shenkman raised with the court a safety concern regarding Vasquez's housing during the trial, and requested time to prepare a motion challenging his housing under federal and California law. Shenkman also represented that she needed additional discovery of Dr. Korpi's interview of Vasquez. Shenkman stated as to the housing motion, "[I]t's a very labor intensive motion. It's not my only motion. And there's a lot of work that I have to do as the court is aware in an office department that's very understaffed." The trial court granted Shenkman's written motion to continue the trial to August 3, 2016, with Vasquez present by videoconference. Shenkman filed her motion regarding housing in May 2016. The trial was later continued to January 23, 2017.

17

5.  *The Critical Three Months: September 27, 2016 Through December 15, 2016*

At the pretrial hearing on September 27, 2016, Shenkman informed the court "that my office is trying to transfer me, and I'm fighting that transfer because it would be very disruptive to my clients in the cases and things that have been set . . . . [A]nd my clients are not happy with the fact that yet again another lawyer is being transferred out.  And that results in the cases having to start anew."  She suggested the court consider the legality of the transfer.

At the next hearing on November 17, 2016, Deputy Public Defender David Santiago appeared on Vasquez's behalf.  The court asked, "Is this your case now?"  He responded, "As of now, it appears to be."  He informed the court he would not be ready for trial on January 23, 2017 and asked for the date to be vacated.  The court asked Vasquez if he was willing to postpone the trial for his new attorney to prepare for trial.  Vasquez stated, "Your Honor, I am not willing to waive my right to have a trial in a timely manner, nor am I willing to waive my right to have prepared counsel.  These constant changes of counsels have denied me both.  Enough is enough.  Also I refuse to be housed in a county jail under the conditions my previous attorney complained about in my motion.  That matter too has been affected by these changes, Your Honor."

The trial court responded by proposing to set the matter for a hearing to consider replacing the public defender's office with a bar panel attorney who could move the case forward more quickly.  Vasquez agreed.  However, Santiago only represented Vasquez for approximately seven or eight days.

At the next hearing on December 15, 2016 Deputy Public Defender Ellen Coleman appeared on Vasquez's behalf, replacing

Santiago. She stated she was not prepared to go to trial on January 23, 2017 and that updated evaluations were required because Dr. Korpi's evaluation would be stale on January 3 and the other evaluation was seven months old.[11] The People opposed a continuance given the age of the case and Vasquez's demand for a trial. Coleman noted in response that Vasquez had previously provided "a written waiver in the past regarding *Litmon*." The trial court asked Vasquez if he was "agreeable to continuing the case past January 23rd let's say, just for argument sake, until March or April so that [Coleman] can have the time to prepare?" Vasquez initially stated he had "no problem with it," but had some issues he wanted to raise with the court. Vasquez added, "Ms. Coleman is more concerned about covering up what the public defender's office has done to me and my case than representing me, and I do not want her as my attorney." The court interpreted this to be a *Marsden* motion,[12] and held a closed hearing, at which it granted the motion and relieved the public defender's office as Vasquez's counsel. The court continued the case to December 22, 2016 for appointment of counsel from the bar panel.

---

[11]    Coleman also stated she needed to file the housing motion, although Shenkman testified she filed the motion in May 2016.

[12]    Under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), a defendant may request that the trial court replace appointed counsel upon a showing that he or she has been denied effective representation of counsel. (*Id*. at pp. 123-124.) The record does not contain a transcript from the closed hearing at which the court granted Vasquez's *Marsden* motion.

6.    *The Final Eight Months: December 22, 2016 Through August 25, 2017*

On December 22, 2016 the trial court appointed bar panel attorney Mark Brandt to represent Vasquez. Brandt told the court he would try to get ready for trial as quickly as he could. The court responded that Vasquez "might have a right to demand that you go to trial even though you're not ready," and set a trial setting hearing for February 21, 2017. The trial court explained to Vasquez, who appeared by videoconference, that he had a right to go to trial within 30 days of the trial setting conference and asked if he understood. Vasquez responded, "I understood that I'm allowing my attorney to handle my case and for him to waive as much time as he requires . . . since he is new to the case."

On February 21, 2017 Brandt stated he had met with Vasquez and was in the process of exploring a possible motion under *Litmon* to dismiss the petition. Brandt stated he was not prepared to go to trial or set a pretrial date. In response to the court's inquiry regarding the trial date, Vasquez responded, "I'm willing to continue it." The trial court granted a continuance over the People's objection to May 25, 2017.

At the May 25, 2017 hearing, Brandt requested a continuance to September 12, 2017 to prepare his motion to dismiss, and noted that the attorneys were still waiting for an additional report from one of the experts. The deputy district attorney expressed a concern about a continuance absent a time waiver from Vasquez, who appeared by videoconference, or a finding of good cause. Brandt responded that he did not "think it's appropriate to have [Vasquez] waive time because there are no time waivers in this. And I'm getting ready as diligently as I can at this point. So to put him in a position that does not comply with the law—and there[] isn't a requirement for a time

20

waiver." The deputy district attorney responded that "while there is no statutory time limit, there is a due process time limit to give him a speedy trial and that's what the whole *Litmon* motion involves." The trial court found good cause and continued the matter to September 20, 2017.

D. *The Motion To Dismiss the Petition*

On August 25, 2017 Brandt filed a motion to dismiss the petition based on the denial of Vasquez's due process right to a speedy trial. The trial court held a hearing on the motion on October 12, 2017, at which Santiago and Shenkman testified.

Santiago testified he represented Vasquez at the November 17, 2016 hearing and continued to represent him for only seven or eight days. He told Vasquez that he would need more time to prepare before setting a new trial date; Vasquez responded that he wanted to proceed to trial in January 2017. Santiago had two or three boxes of files to review and could not be ready by the January 2017 trial date. Santiago raised his concerns with his head deputy, including that Vasquez would either need to give up his right to a speedy trial or have a lawyer who was not sufficiently prepared. The same day the case was reassigned. Santiago felt he "probably could have done an okay job. But . . . Mr. Vasquez was deserving of a good job, and I was not prepared to . . . dangle my bar card out there and risk . . . not giving him a proper defense."

Shenkman testified that she represented Vasquez from June 2012 to October 2016. When she received the case from Hazel, there were many things she needed to do to prepare the case for trial. Vasquez agreed to continue the trial, "but he was always very frustrated and upset, and he felt that he had no choice because I needed to be prepared." Shenkman stated, "the

21

attorney staff was cut.  So it increased our workload.  And you couldn't just ignore those new clients that you were getting who now had yet another lawyer. . . .  So that did slow down the work on Mr. Vasquez's case."  She added, "But I was moving along in doing what I needed to do on the cases.  But there were many cases I had to do those same things on.  However, Mr. Vasquez was a priority."

According to Shenkman, when she learned on September 27, 2016 that she was going to be transferred out of the SVP unit, she sent an e-mail to her head deputy, describing "how disruptive it would be to my clients in terms of trials that were set . . . and that the office would be vulnerable to a *Litmon* motion."  Shenkman requested that the office rescind her transfer order.  Shenkman stated she would have been ready for trial on January 23, 2017.  She was eager to go to trial because she had the first negative evaluation from Dr. Korpi, and was concerned that "if he were to do another report, he would flip, and I thought maybe it would flip in the courtroom."  Ultimately she was transferred out of the SVP unit.

Brandt moved into evidence the face page of Dr. Korpi's February 10, 2017 negative evaluation to support Shenkman's argument that he was going to give a negative evaluation, which Shenkman would have used if they went to trial on January 23, 2017.  Brandt argued that once Dr. Korpi completed his evaluation, there needed to be two additional evaluations, which again delayed the trial.  Brandt claimed it was "unconscionable and unconstitutional" that it had been 17 years since Vasquez received a two-year commitment, during which five deputy public defenders represented Vasquez, and that there had been "a breakdown in the public defender's office."

22

The deputy district attorney pointed out that the delays were not caused by the prosecution, "[s]o in order for this court to make a finding that Mr. Vasquez's 14th Amendment right to a speedy trial has been denied [it would need] to find there is a systemic breakdown in the public defender system as well as a failure of the trial court to allow this to drag on for so long and attribute those actions as state actions."

On January 8, 2018 the trial court issued its order granting Vasquez's motion to dismiss. After reviewing the procedural history of the case and the applicable law, the court found Vasquez was denied due process. Citing the factors set forth in the United States Supreme Court's decision in *Mathews v. Eldridge* (1976) 424 U.S. 319 (*Mathews*), the court explained, "First, forced curtailment of liberty (as here for 17 years) constitutes a massive curtailment of liberty requiring due process protection. [Citation.] Second, the risk of an erroneous deprivation of liberty here is considerable, given that if Mr. Vasquez had gone to trial timely and been committed, he was facing just a two-year commitment. Instead, he has been detained without trial for 17 years. In addition, one of the two state evaluators, Dr. Douglas Korpi, has reached the opinion that Mr. Vasquez no longer qualifies as a sexually violent predator. Third, the government has no interest in involuntarily detaining an individual for 17 years without trial. The burden in going to trial in year two as opposed to going to trial in year 17 involves no additional administrative or fiscal burdens."

Reviewing the factors set forth in *Barker v. Wingo* (1972) 407 U.S. 514 (*Barker*), the court found "that 17 years of pre-trial detention is presumptively prejudicial and oppressive to the maximum degree." Additionally, the reason for the delay "was a systemic breakdown of the public defender system." "As

23

Ms. Shenkman testified at the hearing on the motion, 'the serial representation was very disruptive to the clients because each time somebody has to start anew.' The dysfunctional manner in which the Public Defender's Office handled Mr. Vasquez's case was precisely the type of systemic or institutional breakdown contemplated by *Brillon* and [*People v. Williams* (2013) 58 Cal.4th 197, 232]. Accordingly, the reason for the delay in bringing the case to trial should be attributed to the state, and not to Mr. Vasquez."

The court concluded, "Mr. Vasquez completed his criminal sentence 17 years ago. According to Dr. Korpi, who evaluated Mr. Vasquez many times over that period, Mr. Vasquez no longer qualifies as a sexually violent predator. Nonetheless, the court is well aware of the potential risk to public safety that attends Mr. Vasquez's release from custody, albeit 23 years after his crimes were committed. However, the court cannot subordinate the rights of citizens under the United States Constitution in favor of concerns over public safety. Seventeen years awaiting trial for a two-year commitment is far too long a delay, and leaves this court with no choice. The motion to dismiss Mr. Vasquez's petition is granted."

On February 2, 2018 the People filed a petition for writ of mandate, requesting that this court stay the trial court's order releasing Vasquez pending review and direct the trial court to vacate its January 8, 2018 order dismissing the petition, reinstate the petition, and set the matter for a jury trial. We issued an order to show cause why the trial court should not vacate its January 8, 2018 order, and ordered all trial court proceedings stayed pending review.

24

# DISCUSSION

## A.     *Writ Review Is Appropriate*

An order dismissing a petition filed under the SVPA is appealable as a final judgment.  (Code Civ. Proc., § 904.1, subd. (a)(1); *People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 900, fn. 4; *People v. Superior Court* (*Troyer*) (2015) 240 Cal.App.4th 654, 663.)  However, "the People may alternatively seek writ review, and a stay, when the appellate remedy is inadequate (Code Civ. Proc., § 1086) because the dismissal will result in the release of one potentially dangerous to the public." (*Ghilotti*, *supra*, at p. 900, fn. 4; accord, *Troyer*, *supra*, at p. 663.) Given that the trial court's order granting the motion to dismiss would result in Vasquez's release, writ review is appropriate.

## B.     *Standard of Review*

We review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial pretrial delay.  (See *People v. Jones*, *supra*, 57 Cal.4th at p. 922 [trial court did not abuse its discretion in denying defendant's motion to dismiss after 10-year delay prior to filing murder charges]; *People v. Lazarus* (2015) 238 Cal.App.4th 734, 757, 760 [trial court did not abuse its discretion in denying motion to dismiss based on 23-year delay between murder and filing of charges]; see also *People v. Reynolds* (2010) 181 Cal.App.4th 1402, 1408-1409 [applying abuse of discretion standard to review trial court's dismissal of defendant's petition for unconditional release filed four years

25

after he was recommitted as an SVP, in which he argued he was no longer a danger to the health and safety of others].)[13]

Under an abuse of discretion standard, "'[t]he trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.'" (*Gaines v. Fidelity National Title Ins. Co.* (2016) 62 Cal.4th 1081, 1100; accord, *In re Butler* (2018) 4 Cal.5th 728, 739 [under an abuse of discretion standard, "we consider the court's legal conclusions de novo, and assess its factual findings for substantial evidence"].)

C.     *An Individual Alleged To Be an SVP Has a Due Process*
       *Right to a Timely Trial*

"The Sixth Amendment to the United States Constitution guarantees that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial . . . .' '[T]he right to a speedy trial is "fundamental" and is imposed by the Due Process Clause of the Fourteenth Amendment on the States.' [Citation.]  The speedy trial guarantee 'is an important safeguard to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an

---

[13]     Under section 6608, subdivision (a), a person committed as an SVP may petition for conditional release or an unconditional discharge on the basis he or she is no longer a danger to the health and safety of others.  If the trial court determines the petition is not frivolous, the court is required to set a hearing on the petition.  (§ 6608, subds. (d), (i).)

accused to defend himself.'" (*People v. Williams, supra,* 58 Cal.4th at p. 232 (*Williams*).)

The California Supreme Court in *Williams* analyzed the defendant's right to a speedy trial under the balancing test established by the United States Supreme Court in *Barker.* (*Williams, supra,* 58 Cal.4th at pp. 233-245.) As the court explained, "Because '[t]he speedy-trial right is "amorphous," "slippery," and "necessarily relative,"' the high court in *Barker* 'refused to "quantif[y]" the right "into a specified number of days or months' or to hinge the right on a defendant's explicit request for a speedy trial.' [Citation.] Rather, to determine whether a speedy trial violation has occurred, *Barker* established a balancing test consisting of 'four separate enquiries: whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result.' [Citation.] None of these four factors is 'either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process.' [Citation.] The burden of demonstrating a speedy trial violation under *Barker*'s multifactor test lies with the defendant." (*Id.* at p. 233.)

California courts have also analyzed a defendant's due process right to a speedy trial under *Mathews,* in which the United States Supreme Court applied a balancing test to determine whether due process under the Fourteenth Amendment required a hearing prior to the initial termination of

27

Social Security disability benefits pending a full review. (*Mathews*, *supra*, 424 U.S. at p. 323.)  The court observed, "The 'right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.'  [Citation.]  The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  (*Id*. at p. 333.)

The court concluded, "'"[D]ue process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.'  [Citation.]  '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.'  [Citation.]  . . .  [Citations.]  More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors:  First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Mathews*, *supra*, 424 U.S. at pp. 334-335.)

The SVPA does not establish a deadline by which a trial on an SVP petition must be held after the trial court finds probable cause to believe the inmate is an SVP.[14]  (*People v. Landau* (2013)

---

[14]   Under the SVPA, an individual alleged in a petition to be an SVP is entitled to a hearing within 10 days of a judge's facial review of the SVPA petition to determine whether there is "probable cause to believe that the individual named in the

214 Cal.App.4th 1, 27 (*Landau*).)  Further, the SVPA is a civil commitment proceeding, not a criminal prosecution to which the Sixth Amendment right to a speedy trial attaches.  (See *Litmon, supra*, 162 Cal.App.4th at p. 399 ["It is not entirely clear what analytical framework, *Mathews, Barker* or some amalgam, will ultimately be applied by the United States Supreme Court in evaluating a procedural due process claim of excessive pre-trial delay in the context of involuntary civil commitments."]; *Landau*, at p. 31 [same].)

　　　The Court of Appeal in *Litmon* applied the *Barker* and *Mathews* due process balancing tests to a person alleged to be an SVP, concluding that "[t]he ultimate responsibility for bringing a person to trial on an SVP petition at a 'meaningful time' rests with the government."  (*Litmon, supra*, 162 Cal.App.4th at pp. 399, 406 [finding the appellant's Fourteenth Amendment right to due process was violated by the "excessive delay [of one year] in bringing [the] matter to trial following the declaration of mistrial"]; accord, *Landau, supra*, 214 Cal.App.4th at pp. 33-44 [concluding under *Barker* and *Mathews* that five-year seven-month delay before first trial, 18-month delay before second trial, and four-and-a-half-month delay before third trial did not violate due process]; see *People v. Castillo* (2010) 49 Cal.4th 145, 169 ["the principles articulated in [*Litmon*] were derived from long-established precedent rendered by the United States Supreme Court"]; *People v. Otto* (2001) 26 Cal.4th 200, 209 ["Because civil commitment involves a significant deprivation of liberty, a defendant in an SVP proceeding is entitled to due process protections."].)

---

petition is likely to engage in sexually violent predatory criminal behavior upon his or her release."  (§§ 6601.5, 6602, subd. (a).)

In *Litmon*, David Litmon was found after a jury trial to be an SVP, and was committed to a two-year commitment period.[15] (*Litmon*, *supra*, 162 Cal.App.4th at p. 390.) The trial court consolidated two subsequent recommitment petitions after a mistrial was declared because the jury could not reach a verdict. (*Id.* at p. 391.) Over Litmon's objection, the trial court set the case for a retrial 10 months later because the deputy district attorney had another SVP trial scheduled and witnesses for the trial were engaged in other cases. Litmon filed a motion to dismiss based on a violation of his due process rights. (*Id.* at pp. 391-392.) After the trial court denied the motion, and just before the trial date, the deputy district attorney moved to continue the trial for two more months because he learned when he subpoenaed his witnesses that they were already scheduled to testify in other cases. The trial court denied Litmon's renewed motion to dismiss, and granted the continuance. (*Id.* at p. 394.)

The Court of Appeal reversed, concluding the one-year delay following the mistrial violated Litmon's due process rights. (*Litmon*, *supra*, 162 Cal.App.4th at pp. 404-406.) The court first

[15] As noted above, the SVPA originally provided for a two-year commitment for a person found to qualify as an SVP. (Former § 6604; Stats. 2000, ch. 420, § 3, pp. 3139-3140.) Under former section 6604, an SVP commitment could be extended every two years for an additional two-year period. However, each extension required the filing of a new petition and a determination that the person continued to meet the definition of an SVP. (Stats. 2000, ch. 420, § 3, pp. 3139-3140; see Historical and Statutory Notes, 73E West's Ann. Welf. & Inst. Code (2010 ed.) following § 6604, pp. 149-150.) As part of the 2006 amendment to the SVPA, the two-year commitment term was replaced with an indeterminate term of commitment. (See § 6604; *Landau*, *supra*, 214 Cal.App.4th at p. 28, fn. 9.)

applied the balancing test established in *Mathews*, concluding as to the first factor that """commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."""" (*Litmon*, *supra*, at p. 400.) Further, "'[f]or the ordinary citizen, commitment to a mental hospital produces "a massive curtailment of liberty[]" . . . .'" (*Ibid*.)

As to the second factor, the court concluded the risk of an erroneous deprivation of a liberty interest was "considerable" in light of the lengthy commitment. (*Litmon*, *supra*, 162 Cal.App.4th at p. 400.) As to the third factor, the court observed that while the state has an interest in protecting the public from dangerous individuals, "the state has no interest in the involuntary civil confinement of persons who have no mental disorder or who are not dangerous to themselves or others." (*Id*. at p. 401.)

Applying the *Mathews* factors, the court concluded that "[e]ven if the initial delay in setting trial . . . comported with principles of procedural due process, the postponement of the trial [for two additional months] cannot be reconciled with those principles given [Litmon's] complete loss of liberty awaiting trial." (*Litmon*, *supra*, 162 Cal.App.4th at p. 404.) The court rejected the prosecutor's excuse that he needed additional time to subpoena his expert witnesses, explaining, "the proffered justification is inadequate to excuse a further delay of retrial given the magnitude of the liberty interest at stake, the serious harm to this interest already occasioned by the protracted delay, and the possibility that the interim decisions (the probable cause hearings on the second and third recommitment petitions) may have been mistaken." (*Id*. at p. 405.) The court stated, "[P]ostdeprivation pretrial delays in SVPA proceedings cannot be routinely excused by systemic problems, such as understaffed

31

public prosecutor or public defender offices facing heavy caseloads, underdeveloped expert witness pools, or insufficient judges or facilities to handle overcrowded trial dockets." (*Id*. at p. 403.)

The *Litmon* court next analyzed the factors set forth in *Barker* and concluded the pretrial delays were "extensive," Litmon had asserted his right to due process by strongly opposing the postponement of the retrial, and Litmon was prejudiced by the pretrial confinement. (*Litmon*, *supra*, 162 Cal.App.4th at pp. 405-406.) The court explained, "[Litmon's] fundamental liberty interest outweighed the state's countervailing interests in postponement of the trial . . . . The approximate two-month delay of retrial . . . , although only incremental, meant the cumulative loss of a whole year in custody after mistrial. 'Time is an irretrievable commodity. . . . [T]ime once past can never be recovered.' [Citation.] Under our country's long-standing jurisprudence, a person has a right to liberty that a government may not abridge without due process. If the constitutional right to procedural due process is not to be an empty concept in the context of involuntary SVP commitment proceedings, it cannot be dispensed with so easily. The court should have granted [Litmon's] . . . motion to dismiss the consolidated petitions." (*Litmon*, *supra*, 162 Cal.App.4th at p. 406.)

In *Landau*, the Court of Appeal applied the *Mathews* and *Barker* balancing tests, and concluded that a seven-year delay from the filing of the SVPA petition against Sidney Landau to a third trial in which the jury found that Landau was an SVP (after two mistrials) did not violate his due process rights because the "vast majority" of the delays were at Laudau's request or with his consent. (*Landau*, *supra*, 214 Cal.App.4th at p. 27.)

32

The court observed that the delay of five years and seven months before Landau's first trial resulted principally from defense strategy and a change in attorneys. Further, Landau consented to each continuance. (*Landau*, *supra*, 214 Cal.App.4th at pp. 33, 36.) The court added, "A potential civil committee may not seek to continue his trial over and over again and then be heard to complain the court violated due process by granting his requests." (*Id*. at p. 37.)

Further, the court concluded a 20-day delay caused by court congestion was "relatively minimal" and "does not appear to have been caused by a chronic and systemic problem," but rather, resulted from the fortuity that all the trial courts were in trial. (*Landau, supra*, 214 Cal.App.4th at pp. 36-37.) Further, Landau did not assert his right to a timely trial until six days before trial, when he filed his motion to dismiss. (*Ibid*.)

As to the 18-month delay before the second trial, the court noted that 14 months of the delay was at the request of Landau's counsel and one month of the delay resulted from litigation over the People's discovery motion. (*Landau, supra*, 214 Cal.App.4th at pp. 40-41.) As to the 43-day period in which the case trailed in ready status, the court concluded this delay due to court congestion and failure to prioritize SVP trials was "unsatisfactory," but did not deny Landau due process in light of the prior 14-month delay to which he consented. (*Id*. at pp. 41-42.)

After a second mistrial, there was a four-and-a-half-month delay before a third trial. The trial court again denied Landau's motion to dismiss for prejudicial delay. (*Landau, supra*, 214 Cal.App.4th at pp. 42-43.) On appeal the court concluded that a retrial within four-and-a-half months of the mistrial did not violate Landau's due process rights. Rather, this delay was

33

reasonable in light of the replacement of the deputy district attorney, the complexity of the case, the significant number of experts, and counsel's need to consider the testimony from the first two trials. (*Id*. at pp. 43-44.)

We next turn to the factors considered by the United States Supreme Court in *Barker* and *Mathews*, as applied to the facts here.[16]

D.  *Application of the* Barker *Due Process Factors*

1.  *Length of the Delay*

"The first *Barker* factor, the length of the delay, encompasses a 'double enquiry.' [Citation.] 'Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from "presumptively prejudicial" delay [citation], since, by definition, he cannot complain that the government has denied him a "speedy" trial if it has, in fact, prosecuted his case with customary promptness. If the accused makes this showing, the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim. [Citation.] This latter enquiry is significant to the speedy trial analysis because . . . the

---

[16]     In our analysis we will refer to Vasquez's due process right to a "timely trial" and a trial held at a "'meaningful time,'" as did the courts in *Litmon* and *Landau*. (See *Litmon*, *supra*, 162 Cal.App.4th at pp. 399, 406 [right to a trial "at a 'meaningful time'"]; *Landau*, *supra*, 214 Cal.App.4th at p. 41 [right to a "timely trial"].) However, as part of our application of the due process inquiry under *Barker*, we will also refer to Vasquez's assertion of his right to a "speedy trial."

presumption that pretrial delay has prejudiced the accused intensifies over time.'" (*Williams*, *supra*, 58 Cal.4th at p. 234.)

In *Williams*, the court concluded that "even considering the gravity of the charges, a delay of seven years is 'extraordinary.'" (*Williams*, *supra*, 58 Cal.4th at p. 235; see *Barker*, *supra*, 407 U.S. at p. 533 [delay of over five years was "extraordinary"]; *Litmon*, *supra*, 162 Cal.App.4th at p. 405 [one-year delay "create[d] a presumption of prejudice that triggers a *Barker* type of balancing test"].) The trial court here found "that 17 years of pre-trial detention is presumptively prejudicial and oppressive to the maximum degree." The People concede the 17-year delay triggered a speedy trial analysis under *Barker*. We conclude a 17-year delay before trial is by any measure an "extraordinary" delay that triggers the *Barker* inquiry and weighs against the state.

2.      *Vasquez's Assertion of His Right to a Speedy Trial*

"*Barker* rejected 'the rule that a defendant who fails to demand a speedy trial forever waives his right.' [Citation.] But the high court cautioned that its rejection of the demand-or waiver-rule did not mean that a defendant has no responsibility to assert his right. [Citation.] Rather, 'the defendant's assertion of or failure to assert his right to a speedy trial is one of the factors to be considered in an inquiry into the deprivation of the right.'" (*Williams*, *supra*, 58 Cal.4th at p. 237.)

The trial court found as to Vasquez's assertion of his right to a speedy trial "that this factor [militates] against the state, for several reasons. [¶] First, Mr. Vasquez asserted this right in a very clear manner on November 17, 2016, when he exclaimed in court, 'enough is enough.'" The trial court found that from

35

Vasquez's assertion of his right to a speedy trial on November 17, 2016, there likely would have been a delay of at least a year for a new attorney to get up to speed and update the expert evaluations. The People object to the court's conclusion that it would have taken a year for Brandt to be ready for trial, characterizing this as speculation. However, substantial evidence supports the trial court's conclusion. Brandt made clear at the February 21 and May 25, 2017 pretrial dates that he was not ready to set the case for trial. Even as of the September 20, 2017 pretrial date—eight months after the previously set January 2017 trial date—a trial date had not been set.

The trial court did not err in finding that Vasquez's failure to assert his right to a speedy trial prior to November 16, 2016 should not be weighed against him as to this factor. The trial court found that Vasquez's ability to assert his speedy trial right was hindered by the fact that from February 2002 to February 2012 he never appeared in court.[17] We agree that Vasquez could not realistically have asserted his due process rights during the 10-year period in which he largely did not appear in court. As to the period from February 2012 until his assertion of his right to a speedy trial in November 2016, Vasquez consented to the continuance of his trial. However, starting on October 27, 2014— when Shenkman first complained about her ability to prepare for trial given the 50 percent reduction in staffing at the public defender's office and the resulting increase in her workload— Vasquez only acquiesced in the continuances to enable his attorney to be prepared for trial. As Shenkman stated on March 26, 2015, when she moved for a further continuance of the

_____

[17] As we previously noted, the record reflects that Vasquez appeared by videoconference at one hearing on January 3, 2012.

36

trial date: "Mr. Vasquez does not oppose the continuance. In fact, if the court denies the continuance and sends me out to trial, he does not want to be ordered out for the trial, and he does not want to come down to [Los Angeles] for a trial when his lawyer is not prepared."

As the Supreme Court stated in *Williams*, "'[T]he issue is not simply the number of times the accused acquiesced or objected; rather, the focus is on the surrounding circumstances, such as the timeliness, persistence, and sincerity of the objections, the reasons for the acquiescence, whether the accused was represented by counsel, the accused's pretrial conduct (as that conduct bears on the speedy trial right), and so forth. [Citation.] The totality of the accused's responses to the delay is indicative of whether he or she actually wanted a speedy trial.'" (*Williams*, *supra*, 58 Cal.4th at p. 238.)

Here, in light of the surrounding circumstances during the two-year period from October 27, 2014 through November 16, 2016, Vasquez's failure to object to the multiple continuances of the trial date cannot be weighed against him given his stated desire that Shenkman be prepared for trial. The People ascribe to Vasquez a desire to avoid trial given the repeated positive evaluations from the People's experts and his failure to participate in a sex offender treatment program until September 2015. However, there is no evidence in the record to support the People's contention that Vasquez did not want to have a trial on the petition. Rather, we find substantial evidence supports the trial court's conclusion that Vasquez "was forced to choose between proceeding to trial with an unprepared attorney, or giving up his right to a speedy trial—truly a Hobson's choice.

Under these circumstances, it is unfair to give significant weight to Mr. Vasquez's failure to assert his right to a speedy trial."[18]

### 3. *Prejudice to Vasquez*

"Whether [a] defendant suffered prejudice as a result of the delay must be assessed in light of the interests the speedy trial right was designed to protect: '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.'" (*Williams*, *supra*, 58 Cal.4th at p. 235, quoting *Barker*, *supra*, 407 U.S. at p. 532.) As the court in *Litmon* observed, "[L]engthy postdeprivation pretrial delay in an SVP proceeding is oppressive. In this case, we cannot turn a blind eye to the years of pretrial confinement that have elapsed following expiration of the last ordered term of commitment." (*Litmon*, *supra*, 162 Cal.App.4th at p. 406; see *Barker*, at pp. 532-533 ["The time spent in jail is simply dead time."]; accord, *Williams*, *supra*,

---

[18] In *Williams* the People argued that because the defendant had consented to 17 out of 19 continuances, he had not asserted his right to a speedy trial. (*Williams, supra*, 58 Cal.4th at p. 238.) The defendant responded, as here, that he only waived time because he had no alternative given his attorney's lack of preparation. (*Ibid*.) The court did not reach whether the defendant's acquiescence in the continuances showed his lack of "a sincere desire to have a speedy trial" in light of its conclusion that the delays in the trial were principally attributable to the defendant. (*Id.* at pp. 238-239.) In *Litmon*, the court observed that "a belated assertion of a procedural due process right to a speedy SVP trial is entitled to less weight than a prompt assertion of such right," but gave "serious weight" to Litmon's assertion of his right in his later motion to dismiss. (*Litmon, supra*, 162 Cal.App.4th at p. 405.)

at p. 235 ["We have no difficulty concluding, even in light of the complexity of the case and the need for adequate preparation, that being jailed without a trial for seven years is 'oppressive.'"].)

To demonstrate prejudice, Vasquez need not show "a loss of witnesses, loss of evidence, or fading memories," as the People contend. Rather, it is the loss of time spent in pretrial custody that constitutes prejudice. (*Litmon, supra*, 162 Cal.App.4th at pp. 405-406.) The People contend Vasquez suffered no prejudice notwithstanding his 17 years of pretrial confinement because every evaluation until February 2017 was positive. However, Vasquez started to participate in the sex offender treatment program in September 2015. This could have impacted the outcome of his trial, yet he waited another two years for his trial. Moreover, discounting the time Vasquez spent in pretrial confinement under the People's theory assumes the right to a jury trial is a mere formality. It may well be there was strong evidence in the People's favor, but it was the government's burden to prove Vasquez was an SVP and Vasquez had a right to present evidence showing he did not pose a risk to the public. He was denied this right for 17 years. As the court in *Litmon* observed, a defendant's "extended confinement without any determination that he [is] an SVP" results in an irretrievable loss of liberty, "regardless of the outcome of trial." (*Litmon, supra*, 162 Cal.App.4th at p. 400.)

Here, the trial court found 17 years of involuntary pretrial detention was presumptively prejudicial, "particularly in light of the fact that [Vasquez] originally faced a two-year commitment if found qualified under the statute. Those 17 years are gone. As the *Litmon* . . . court observed, time once past can never be recovered." We agree. There can be no question that a 17-year delay from the filing of the petition caused an "'oppressive'"

period of pretrial confinement. (*Williams*, *supra*, 58 Cal.4th at p. 235.) However, as the *Williams* court explained, "[T]he presumption of prejudice would weigh heavily in defendant's favor *if* the cause of the delay was official negligence." (*Id.* at p. 237.) As in *Williams*, the cause of the delay is the pivotol question for our due process inquiry.

### 4.     *The Reason for the Delay*

"A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." (*Barker, supra,* 407 U.S. at p. 531, fn. omitted; accord, *Williams*, *supra*, 58 Cal.4th at p. 239.)

We follow the approach of the Supreme Court in *Williams*, and consider the conduct of the prosecution, the defense, and the trial court.

### a.     *The prosecution*

Vasquez does not argue that the prosecution was responsible for the delay. Nor could he. Unlike in *Litmon* where the prosecutor's delay in subpoenaing trial witnesses caused the delay (*Litmon, supra*, 162 Cal.App.4th at pp. 404-405), starting on January 20, 2015 the deputy district attorney repeatedly objected to continuance of the trial date. Indeed, on March 26, 2015, in response to Shenkman's request for a further continuance, the deputy district attorney urged the trial court to remove the public defender's office and appoint new counsel for Vasquez so the case could proceed to trial. The deputy district

40

attorney continued to object to further continuances of the trial, including on February 21, 2017, when the trial court continued the trial date to May 25, 2017 in response to Brandt's motion.

### b. *The defense*

As the United States Supreme Court explained in *Brillon*, "Because 'the attorney is the [defendant's] agent when acting, or failing to act, in furtherance of the litigation,' delay caused by the defendant's counsel is also charged against the defendant. [Citation.] The same principle applies whether counsel is privately retained or publicly assigned, for '[o]nce a lawyer has undertaken the representation of an accused, the duties and obligations are the same whether the lawyer is privately retained, appointed, or serving in a legal aid or defender program.' [Citation.]" . . . Unlike a prosecutor or the court, assigned counsel ordinarily is not considered a state actor." (*Brillon*, *supra*, 556 U.S. at pp. 90-91.)

In *Brillon*, Michael Brillon was represented by six different attorneys over a three-year period before he was brought to trial. (*Brillon*, *supra*, 556 U.S. at pp. 85-88.) The Vermont Supreme Court concluded that two years of the delay should be attributed to the state because the delays were "'caused, for the most part, by the failure of several of defendant's assigned counsel, over an inordinate period of time, to move his case forward.'" (*Id.* at pp. 88-89.) The United States Supreme Court reversed, concluding, "The Vermont Supreme Court erred in attributing to the state delays caused by" assigned counsel's failure to move the case forward and failing to consider Brillon's "disruptive behavior in the overall balance." (*Id.* at pp. 91-92.) The court explained, "An assigned counsel's failure 'to move the case forward' does not warrant attribution of delay to the State. Contrary to the

41

Vermont Supreme Court's analysis, assigned counsel generally are not state actors for purposes of a speedy-trial claim. While the Vermont Defender General's office is indeed 'part of the criminal justice system,' [citation], the individual counsel here acted only on behalf of Brillon, not the State." (*Id.* at p. 92.)

The court concluded the delay caused by the three attorneys who represented Brillon during the last two years, all of whom requested extensions and continuances, should not be attributed to the state. (*Brillon*, *supra*, 556 U.S. at p. 92.) The court explained, "A contrary conclusion could encourage appointed counsel to delay proceedings by seeking unreasonable continuances, hoping thereby to obtain a dismissal of the indictment on speedy-trial grounds." (*Id.* at p. 93.)

The court decided that the Vermont Supreme Court also erred in failing to consider Brillon's role in causing the removal of his first three attorneys, which led to the later delays. (*Brillon*, *supra*, 556 U.S. at p. 93.) Specifically, Brillon sought to dismiss his first attorney on the eve of trial, resulting in the trial court granting the attorney's motion to withdraw as counsel. (*Id.* at pp. 86, 93.) After the second attorney withdrew almost immediately because of a conflict, a third attorney represented Brillon for three months. (*Id.* at pp. 86-87.) The defendant sought to dismiss this attorney for failing to file motions and a lack of communication and diligence, but the attorney responded that "he had plenty of time to prepare" and simply disagreed with Brillon on trial strategy. (*Ibid.*) That attorney later withdrew as counsel after Brillon threatened his life during a courtroom break. (*Id.* at pp. 87, 93.)

The trial court warned Brillon, "[T]this is somewhat of a dubious victory in your case because it simply prolongs the time that you will remain in jail until we can bring this matter to

42

trial.'" (*Brillon, supra*, 556 U.S. at p. 87.) According to the *Brillon* court, by these actions it was Brillon who delayed the trial, likely making it difficult for the public defender's office to find a replacement counsel. (*Id*. at p. 93.) Even after the trial court warned Brillon that his actions were causing delay, the defendant sought to dismiss his fourth attorney, whom the trial court dismissed after he reported his contract with the public defender's office had expired, without making findings as to the adequacy of the attorney's representation. (*Id*. at pp. 87-93.) It was not until eight months later that his sixth and final attorney was appointed. (*Id*. at pp. 87-88.)

The *Brillon* court concluded, "Just as a State's 'deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the [State],' [citation], so too should a defendant's deliberate attempt to disrupt proceedings be weighted heavily against the defendant. Absent Brillan's deliberate efforts to force the withdrawal of [his attorneys], no speedy-trial issue would have arisen. The effect of these earlier events should have been factored into the court's analysis of subsequent delay." (*Brillon, supra*, 556 U.S. at pp. 93-94.)

Notably, however, the *Brillon* court carved out an exception, stating, "The general rule attributing to the defendant delay caused by assigned counsel is not absolute. Delay resulting from a systemic 'breakdown in the public defender system,' [citation], could be charged to the State. [Citation.] But the Vermont Supreme Court made no determination, and nothing in the record suggests, that institutional problems caused any part of the delay in Brillon's case." (*Brillon, supra*, 556 U.S. at p. 94.)

The California Supreme Court in *Williams* considered whether in light of *Brillon*, the failure of eight appointed attorneys over a seven-year period to bring the criminal case to

43

trial was attributable to the defendant or the result of "a breakdown in the public defender system." (*Williams*, *supra*, 58 Cal.4th at p. 245.)  During the seven years, the defendant brought 12 *Marsden* motions, mostly complaining about the lack of progress by his appointed attorneys.  (*Id.* at pp. 216-219, 223-224, 231-232.)

The court first attributed to the defendant the 13-month period during which he was happy with the progress made by his appointed counsel; the 10-and-a-half-month period in which he represented himself, during which he failed to subpoena witnesses, sued his standby counsel, moved to disqualify the judge and prosecutor, and had a conflict with the investigator; the several-month delay after his attorney withdrew as counsel after the defendant sued him for malpractice; and the last six-month period before trial during which he waived time while his eighth attorney prepared for trial.  (*Williams*, *supra*, 58 Cal.4th at pp. 219-221, 240-241.)

As to the remaining four years while the defendant awaited trial, the court concluded "that the lion's share of delay resulted from defense counsel's lack of progress in preparing this case for trial.  However, because we are unable to conclude on appellate review of the record before us that the delay resulted from a 'systemic "breakdown in the public defender system"' [citation], we must, as a matter of law, charge the delay resulting from defense counsel's lack of progress to defendant."  (*Williams*, *supra*, 58 Cal.4th at p. 241.)

The court observed that the defendant's first trial counsel responded to the defendant's *Marsden* motion by stating, "'He's right.  I am too busy.  I would like to get rid of a few cases.'" (*Williams*, *supra*, 58 Cal.4th at p. 241.)  That attorney later stated "that he was proceeding 'as diligently as [he could] at this

44

point, given the staff level that [he had] among qualified persons'
but that his being 'in court every day, all day' was impeding his
ability to work on motions." (*Ibid*.)  Subsequently, the public
defender's office declared a conflict that required defendant's
counsel to withdraw, resulting in an approximate six-month
delay in obtaining appointed counsel.  (*Id*. at p. 242.)  The next
attorney complained that no investigation had been done in the
six months since the public defender's office was relieved as
counsel.  (*Ibid*.)  This attorney also stated he had been unable to
work on the defendant's case because he was engaged in two
other capital cases.  (*Id*. at pp. 242-243.)  He later withdrew as
counsel because of a conflict of interest.  (*Id*. at p. 243.)  During
the next year before the court granted the defendant's *Faretta*[19]
motion to represent himself, the seventh attorney did not make
significant progress in the case, and for three to four months was
waiting for funding for an investigator.  (*Ibid*.)  The final attorney
who took the matter to trial proceeded "with reasonable
diligence."  (*Id*. at p. 244.)

The court explained, "The record thus indicates that most
of the delay in this case, apart from the periods already
attributed to defendant, resulted from defense counsel's failure to
make progress in preparing defendant's case.  Consistent with
defendant's frequent complaints, defense counsel repeatedly
acknowledged—at the beginning, in the middle, and even toward
the end of the pretrial period—that little or no work had been
done on defendant's case.  The problem was exacerbated by what
the prosecution called 'the revolving door of defense attorneys.'
Defendant was represented by a total of eight attorneys over the
seven-year period—two from the public defender's office . . . and

---

[19]     *Faretta v. California* (1975) 422 U.S. 806, 819.

six from the criminal defense panel . . . each of whom needed time to review the case and many of whom apparently spent months doing little or no work on the case, only to withdraw later because of a conflict." (*Williams*, *supra*, 58 Cal.4th at p. 244.)

The court recognized the challenges facing overworked public defenders, stating: "We are mindful of the weight and complexity of the heavy caseloads that many public defenders carry, and we recognize the essential service that public defenders provide to their clients and to the criminal justice system. Further, we realize that defense counsel generally act out of duty and good faith when they resist subjecting their clients to trial until defense theories and evidence have been fully investigated and developed. Here, however, the apparent inability of multiple attorneys—first [a deputy public defender] and then [the bar panel] attorneys . . . to move defendant's case forward in a timely manner suggests more than the usual challenges facing appointed counsel." (*Williams*, *supra*, 58 Cal.4th at pp. 244-245.)

The *Williams* court distinguished *Brillon*, noting that the first three years of delay there were "'caused mostly by Brillon.'" (*Williams, supra*, 58 Cal.4th at p. 248.) By contrast, in *Williams*, the "defendant endured a much longer delay, approximately four years of which resulted from the chronic lack of progress and repeated coming and going of defense counsel notwithstanding defendant's recurring complaints that nothing was being done to bring him to trial." (*Ibid*.)

However, the court observed that the record did not support a finding there was a systemic breakdown in the public defender system, as opposed to the lack of progress by individual appointed attorneys. (*Williams*, *supra*, 58 Cal.4th at p. 248.) The court explained, "It is possible that the 'revolving door' of

appointed counsel in this case is indicative of 'institutional problems' [citation] in Riverside County's Indigent Defense Program. But the record on appeal contains no facts that affirmatively support this conclusion. Because defendant did not file a motion to dismiss on speedy trial grounds in the trial court, the underlying cause of the delay in this case was never litigated, the various statements by defendant and his attorneys were never examined in an adversarial proceeding, and the trial court made no findings that might inform the issue before us." (*Ibid*.)

The court concluded, "[T]he record in this case suggests more than the usual challenges facing appointed counsel. But in the absence of evidence identifying *systemic* or *institutional* problems and not just problems with individual attorneys, we are unable to conclude on direct appeal that the delay experienced by defendant resulted from a breakdown in the public defender system. In other words, the record before us contains no facts about the public defender *system* that would support a finding of a *systemic* breakdown. Accordingly, on this record, we are required by *Brillon* to charge to defendant the delay in this case resulting from defense counsel's lack of progress." (*Williams*, *supra*, 58 Cal.4th at p. 249.)[20]

---

[20] In their reply, the People cite to two unpublished district court opinions, *Kindred v. California Dept. of State Hospitals-Coalinga* (C.D.Cal., Nov. 13, 2017, No. 8:17-cv-00047-DSF-KES) 2017 WL 7163929, report and recommendation adopted in *Kindred v. California Dept. of State Hospitals-Coalinga* (C.D.Cal., Jan. 30, 2018, No. SA CV 17-00047-DSF (KES)) 2018 WL 626231, and *Hunter v. King* (E.D.Cal., May 26, 2016, No. 1:15-CV-01611-JLT) 2016 WL 3019119. "'Although not binding precedent on our court, we may consider relevant, unpublished federal district court opinions as persuasive.'" (*Walker v. Apple, Inc.* (2016) 4 Cal.App.5th 1098, 1108, fn. 3; accord, *Farm Raised Salmon Cases*

In this case, we agree with the People that the extreme length of the delay in bringing Vasquez's SVPA petition to trial is not dispositive, in that we cannot attribute the entire 17-year delay to the state.  Instead, we review the principal periods of Vasquez's confinement while his attorneys prepared for trial.[21]

(2008) 42 Cal.4th 1077, 1096, fn. 18 [finding reasoning in unpublished federal district court opinion persuasive].)

In *Kindred v. California Dept. of State Hospitals-Coalinga*, in concluding an approximately 13-year delay in bringing an SVPA petition to trial did not violate the petitioner's due process rights, the court found the delay from defense counsel's need to prepare for trial, including to retain experts, should be attributed to the petitioner.  (*Kindred*, *supra*, 2017 WL 7163929 at p. *18.) In *Hunter v. King*, the district court concluded an 18-year delay before trial on an SVPA petition did not violate the petitioner's due process rights where the petitioner did not object to his counsel's repeated requests for continuances, he first raised his right to a speedy trial 18 years after the petition was filed, and he benefitted from the delay because once he was over 60 he was considered less dangerous.  (*Hunter v. King*, *supra*, 2016 WL 3019119 at pp. *6-7.)  In neither case was there evidence that the delay was caused by a breakdown in the public defender system.

[21]     We deny Vasquez's request to take judicial notice of the dismissal order in *People v. Zavala* (Super. Ct. L.A. County, 2016, No. ZM005809).  While we may take judicial notice of court records, including minute orders (Evid. Code, § 452, subd. (d)), we cannot "take judicial notice of the truth of the factual findings and determinations on which [a court] order is based" (*Steed v. Department of Consumer Affairs* (2012) 204 Cal.App.4th 112, 122; accord, *Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1568 ["A litigant should not be bound by the court's inclusion in a court order of an *assertion of fact* that such litigant has *not* had the opportunity to contest or dispute."]).  Vasquez's request that we consider the factual findings by the trial court in *People v. Zavala*

                    i.     The first 14 years: September 7, 2000 to
                           July 25, 2014

     Suzuki represented Vasquez for the seven-year period from
the filing of the petition until September 2007.  Vasquez
appeared at the first 16 court appearances, then Suzuki waived
his appearance for the next 35 hearings.  During this period,
other than Suzuki's successful motion to vacate the probable
cause determination under *Cooley v. Superior Court, supra*, 29
Cal.4th 228, the record does not reflect any other progress in
preparation of the case for trial.

     Over the next four-and-a-half years, Hazel appeared on
Vasquez's behalf 23 times, waiving Vasquez's appearance for all
but one hearing.  During this period Hazel appeared to make no
progress other than his successful *In re Ronje* motion, which
resulted in the trial court ordering new evaluations and a new
probable cause hearing.  During this period the trial court set the
first trial date for March 2010.

     Although neither Suzuki in his seven years nor Hazel in his
four-and-a-half years of representation made significant progress
in moving Vasquez's case toward trial, there is no evidence that
this delay resulted from a breakdown in the public defender
system.  Thus, as in *Williams*, "we are required by *Brillon* to
charge to defendant the delay in this case resulting from defense

---

to show a systemic breakdown in the public defender system
seeks to have us improperly consider the truth of the findings in
the trial court's order.

49

counsel's lack of progress" during most of this 11-and-a-half-year period.  (*Williams, supra*, 58 Cal.4th at p. 249.)[22]

In June 2012 Shenkman replaced Hazel as counsel for Vasquez.  We attribute to Vasquez the delay during Shenkman's first two years as his attorney because she made diligent progress during most of the period, including filing a motion to replace Drs. Updegrove and Korpi, which resulted in the trial court ordering new evaluations and a new probable cause hearing, and a later motion under *Reilly, supra*, 57 Cal.4th 641, for a new probable cause hearing.  In addition, Vasquez agreed to a 10-month continuance for Shenkman to evaluate whether to seek appellate review of the trial court's order denying Vasquez's motion to replace the evaluators.

---

[22]     During the three-month period from February 14 to May 30, 2007, the public defender's office announced it was unavailable for trial under *In re Edward S., supra*, 173 Cal.App.4th 387.  It was only on May 30, 2007 that Suzuki reported the office had funding to proceed to trial on Vasquez's behalf.  This three-and-a-half-month period is attributable to the state because the public defender's office, by its own declaration, did not have the funding to provide representation to Vasquez.  Pursuant to *Brillon* and *Williams*, just as gaps in a trial court's appointment of replacement counsel for a defendant "with dispatch" is charged to the state, a lack of funding for the public defender's office to provide *any* representation to an indigent defendant constitutes "'a breakdown in the public defender system.'" (*Brillon, supra*, 556 U.S. at p. 85; accord, *Williams, supra*, 58 Cal.4th at p. 247.)

Over the two-year period starting in October 2014, Shenkman repeatedly raised with the trial court her inability to prepare for trial given the 50 percent cut in her office's staff and her increased workload. On October 27, 2014 Shenkman explained she had not had time to meet with her defense expert. On December 8, 2014 she explained she needed a further continuance because she was juggling Vasquez's case with two other probable cause hearings and a restoration of sanity hearing. Her lack of progress was exacerbated by the loss of her paralegal, then the need for her new paralegal (also with a heavy workload) to review Vasquez's case. As Shenkman stated on January 26, 2015, "[I]t's not as if I can drop work on all my other cases in order to focus on this."

In 2015 some progress was made on Vasquez's case, including preparation of new evaluations and efforts by Shenkman to take the experts' depositions. But on March 10, 2016 Shenkman complained that her office's staffing cuts hampered her ability to prepare a housing motion on behalf of Vasquez, which she filed two months later. Shortly thereafter, the trial date was continued yet again to January 23, 2017.

Just four months before trial, after her September 27, 2016 court appearance, Shenkman was transferred out of the SVP unit. According to Shenkman, had she not been transferred, she would have been ready for trial by the January 23, 2017 trial date. It was on November 17, 2016, after Santiago requested that the trial court vacate the January 2017 date, that Vasquez first refused to agree to a continuance, stating, ". . . I am not willing to waive my right to have a trial in a timely manner, nor am I willing to waive my right to have prepared counsel. These

constant changes of counsels have denied me both. Enough is enough." When Coleman appeared at the December 15, 2016 hearing, Vasquez expressed his continued frustration with the public defender's office, and the trial court granted his *Marsden* motion, relieving the public defender's office as his counsel. It was Vasquez's sixth attorney, bar panel attorney Brandt, who filed the motion to dismiss eight months later on August 25, 2017.

We must view the two-year period from October 27, 2014 through December 15, 2016, in which Shenkman, Santiago, and Coleman represented Vasquez, in light of both the 14-year delay that preceded it and the eight-month delay that followed, leading up to the motion to dismiss. Although we have attributed all but three-and-a-half months of the delay during the first 14 years to Vasquez, the public defender's office had a responsibility when Shenkman assumed representation of Vasquez in June 2012 diligently to bring his aging case to trial. However, instead of focusing its resources on this task, Shenkman was hampered in her preparation for trial by the dramatic staffing cuts in the office,[23] which limited the time she could spend on Vasquez's case. As a result, over the two-year period starting at the end of 2014, there was at best sluggish progress in moving Vasquez's then 14-year old case to trial. This situation was exacerbated when Shenkman was finally ready to proceed to trial in January 2017, but was removed from the case. Both Shenkman and

---

[23] Although Vasquez's counsel did not provide details on the staffing cuts other than Shenkman's repeated statements that the office suffered 50 percent cuts in attorneys and staff, the People did not present any evidence to rebut Shenkman's statements.

Santiago raised a concern with the head deputy of the public defender's office, consistent with their responsibility under *In re Edward S.* (2009) 173 Cal.App.4th 387 (*Edward S.*), but to no avail.

As the court in *Edward S.* explained, "Under the ABA Opinion [addressing ethical obligations of a deputy public defender],[24] a deputy public defender whose excessive workload obstructs his or her ability to provide effective assistance to a particular client should, with supervisorial approval, attempt to reduce the caseload, as by transferring nonrepresentational responsibilities to others, refusing new cases, and/or transferring cases to another lawyer with a lesser caseload. If the deputy public defender is unable to obtain relief in that manner, the ABA Opinion provides that he or she must 'file a motion with the trial court requesting permission to withdraw from a sufficient number of cases to allow the provision of competent and diligent representation to the remaining clients.'" (*Edward S.*, *supra*, 173 Cal.App.4th at p. 413.)[25]

---

[24] Formal Opinion No. 06-441, *Ethical Obligations of Lawyers Who Represent Indigent Criminal Defendants When Excessive Caseloads Interfere with Competent and Diligent Representation* (ABA Com. on Ethics & Prof. Responsibility, Formal Opn. No. 06–441 (2006) (ABA Opinion 06–441).)

[25] If a deputy public defender is unable to obtain relief from his or her supervisor, the ABA Opinion provides that "the lawyer should continue to advance up the chain of command within the office until either relief is obtained or the lawyer has reached and requested assistance or relief from the head of the public defender's office." (ABA Opinion 06–441, *supra*, at p. 6.) The supervising public defender must ensure that his or her deputies' excessive caseload does not prevent them from providing "'competent and diligent representation'" of their clients.

53

Although Shenkman did not file a motion requesting permission to withdraw as counsel, she properly requested relief from her head deputy, as did Santiago. Following Vasquez's successful *Marsden* motion, it appears that Brandt diligently attempted to prepare for trial, but as of the filing of Vasquez's motion to dismiss on August 25, 2017, eight more months had passed, with no trial date in sight.

On this record, the trial court did not err in finding "[t]he dysfunctional manner in which the Public Defender's Office handled Mr. Vasquez's case was precisely the type of systemic or institutional breakdown contemplated by *Brillon* and *Williams*. Accordingly, the reason for the delay in bringing the case to trial should be attributed to the state, and not to Mr. Vasquez." In contrast to the facts before the courts in *Brillon* and *Williams*, in which lengthy delays resulted from the failure of individual attorneys to move the defendants' cases forward, here the record supported the trial court's conclusion that there was a breakdown in the public defender system. (See *Williams*, *supra*, 58 Cal.4th at pp. 248-249; see also *Brillon*, *supra*, 556 U.S. at pp. 92-94.)

Moreover, in *Brillon*, the defendant's actions in seeking to dismiss his first attorney, threatening the life of his third attorney, and seeking to dismiss his fourth attorney, were considered a "deliberate attempt to disrupt [the] proceedings,"

_____

(*Edward S.*, *supra*, 173 Cal.App.4th at p. 415, fn. 11, italics omitted.) "'If a supervisor knows that a subordinate's workload renders the lawyer unable to provide competent and diligent representation and the supervisor fails to take reasonable remedial action [citation], the supervisor himself [or herself] is responsible for the subordinate's violation of the Rules of Professional Conduct.'" (*Ibid*., italics omitted, quoting ABA Opinion 06–441, *supra*, at p. 8.)

resulting in the "speedy-trial issue." (*Brillon, supra*, 556 U.S. at pp. 93-94.) There is no similar evidence of any disruptive conduct by Vasquez during the entire 17-year period. Neither is there evidence of any effort by Shenkman (or the other deputy public defenders) "to delay proceedings by seeking unreasonable continuances," a concern raised by the *Brillon* court. (*Id*. at p. 93.) To the contrary, the record reflects Shenkman's frustration at her inability to dedicate the necessary resources to Vasquez's case, causing her to file multiple written motions to continue the trial.

We also have a more complete record than the one before the Supreme Court in *Williams*, in which the court noted that because the defendant had not filed a motion to dismiss on speedy trial grounds, on appeal there was no record of whether the delays resulted from the individual attorneys' inability to manage their caseloads or "unreasonable resource constraints . . . or other systemic problems." (*Williams*, *supra*, 58 Cal.4th at p. 249.) Here, an extensive record supported Vasquez's motion to dismiss, including the testimony of Shenkman and Santiago. We also have the benefit of the trial court's factual findings in its detailed 10-page ruling.

While we recognize that an individual public defender will at times have a heavy caseload that hinders his or her ability to move a case swiftly toward trial, this is a far cry from the dramatic budget cuts in the public defender's office that impeded Shenkman's preparation for trial over a two-year period, then caused yet another year of delay after she was transferred out of the SVP unit on the eve of trial. As a result, Vasquez still had not been afforded a trial after 17 years of confinement. As a general matter, the public defender's office must have the flexibility to decide when it is necessary internally to change the

assignment of an attorney. But when viewed in the context of the extraordinary delay in Vasquez's trial as of Shenkman's transfer date, this flexibility must yield to the individual's right to a timely trial. Vasquez had it right when he exclaimed, "Enough is enough."

In light of the presumptively prejudicial 17-year delay, Vasquez's assertion of his right to a speedy trial on November 17, 2016 and his limited ability to assert his right prior to that date, the oppressive nature of Vasquez's confinement for 17 years, and the systemic breakdown in the public defender system that caused the final two- to three-year delay in bringing Vasquez's matter to trial, the trial court did not err in finding "that all four factors under *Barker v. Wingo* [militate] in favor of Mr. Vasquez, and against the state. Dismissal is mandatory." (See *People v. Jones*, *supra*, 57 Cal.4th at p. 922; *People v. Lazarus*, *supra*, 238 Cal.App.4th at p. 757.) We also discuss below the trial court's role in the delay, which supports our conclusion that Vasquez's due process right to a timely trial was violated.

### c. *The trial court*

Vasquez has focused his speedy trial claim on the systemic breakdown in the public defender system. We conclude the trial court must share responsibility for some of the delay. As the Supreme Court has stated, "'"the primary burden' to assure that cases are brought to trial is 'on the courts and the prosecutors.'" [Citation.] Furthermore, "society has a particular interest in bringing swift prosecutions, and society's representatives are the ones who should protect that interest." [Citation.] Thus, the trial court has an affirmative constitutional obligation to bring the defendant to trial in a timely manner.'" (*Williams*, *supra*, 58 Cal.4th at p. 251; accord, *Landau*, *supra*, 214 Cal.App.4th at p. 41 ["the court and the district attorney bear ultimate

responsibility for providing a timely trial to a person against whom an SVP petition has been filed"]; *Litmon*, *supra*, 162 Cal.App.4th at p. 406 ["'the primary burden [is] on the courts and the prosecutors to assure that cases are brought to trial'"].) To the extent the trial court is responsible for a portion of the delay, it is attributable to the state. (*Landau*, at p. 41; *Litmon*, at p. 406.)

We recognize the trial court did not initiate any of the continuances, instead granting continuances at the request of Vasquez's counsel or by stipulation of counsel. The record shows that many of these continuances were granted for good cause, including, for example, while the attorneys were waiting for new expert evaluations or after the trial court ruled that a new probable cause hearing was required. However, during the first 14 years of Vasquez's confinement, his case was continued over 50 times, either by stipulation of counsel or a request by Vasquez's counsel.[26] The record does not reflect whether the trial court made a finding of good cause for these continuances. As the Supreme Court observed in *Williams*, "'[I]t is entirely appropriate for the court to set deadlines and to hold the parties strictly to those deadlines unless a continuance is justified by a concrete showing of good cause of the delay.'" (*Williams*, *supra*, 58 Cal.4th at p. 251.) It does not appear from the record that during the first 14-year period the trial court took meaningful action to set deadlines or otherwise control the proceedings and protect Vasquez's right to a timely trial. While it may be that Vasquez

---

[26]     During this period, more than 10 judicial officers presided over Vasquez's case. By the time Judge James Bianco first presided over Vasquez's case on December 8, 2014, Vasquez's case had been pending for over 14 years.

57

was not seeking a speedy trial because he was facing evaluations supporting his commitment, we cannot tell because Vasquez was not present in court during most of this period. Neither is there a record of any inquiry by the trial court as to why the case was dragging on for so many years. Even where the attorneys stipulate to continue a trial date, the trial court has an obligation to determine whether there is a good cause for the continuance. The trial court also has a responsibility absent a written time waiver to inquire of a defendant whether he or she agrees to the delay. Had the trial court inquired of Vasquez during this first 14-year period, we would know whether Vasquez was seeking a speedy trial, or was content to let his case be continued so long as the evaluations supported his commitment.

We are particularly troubled by the delay starting in October 27, 2014, when Shenkman reported for the first time that she needed additional time to prepare for trial in light of the 50 percent staffing reductions in the public defender's office, which frustrated her ability to prepare for trial. Shenkman noted on December 8, 2014 that she had an increase in her workload and was simultaneously handling two probable cause hearings and a restoration of sanity hearing. She added that she had explained this to Vasquez, and "he wants me to be prepared, and he is willing to give me whatever time that I need in order to prepare for his trial."

The trial court responded, "Here is what I am going to do, Ms. Shenkman. I am going to give you 90 days to conduct the depositions. Then we are going to have a trial. Okay? So let's get a date in about four months for trial. And if you can't get it done, then I am going to consider relieving your office. . . . You have had this case for 14 years. I understand that your office

58

made a decision to cut staff and to reassign cases.  But 14 years is a very very long time.  This case needs to move forward."

Although the trial court made its intention known to set the trial in 90 days—in March 2015—that did not happen.  Instead, Shenkman filed multiple written motions to continue, and the trial court repeatedly found good cause to continue the trial date.  It was not until Vasquez voiced his objection to any further continuances at the November 17, 2016 hearing that the trial court later granted Vasquez's *Marsden* motion, relieving Coleman and the public defender's office as counsel.

The trial court could have acted sooner.  In March 2015 the trial court should have at least *considered* whether to relieve the public defender's office as counsel, as the trial court had suggested 90 days earlier.  We recognize, as the Supreme Court noted in *Williams*, that the trial court was in a "difficult position" when faced with defense counsel's continued lack of progress in moving the case toward trial.  (*Williams*, *supra*, 58 Cal.4th at p. 250.)  As the court explained, "When a defense attorney requests more time to prepare for trial, the trial court must balance a defendant's right to a speedy trial with his right to competent counsel."  (*Ibid*.)  The court added, "We appreciate the dilemma confronting the trial court and do not suggest that it abused its discretion in granting the 19 continuances that occurred here.  But we note (with the obvious benefit of hindsight) that the trial court could have done more to move this case to trial once the mounting delay became evident."  (*Ibid*.)

The court observed, "In granting continuances at the request of defense counsel, the trial court understandably sought to ensure adequate preparation and a fair trial.  'What is clear, though'—to borrow apt language from a decision of a sister high court—'is that the [trial court] accommodated repeated requests

to postpone hearings, extend deadlines, and continue the trial based on vague assertions about more time being needed.  The record reflects that the court was concerned about [defendant's] right to prepare a defense, but also about the ramifications the delays were having on his right to a speedy trial.  And we commend the court for trying to make the best of a difficult situation in which it had to replace defense counsel [multiple] times and, in so doing, had to give new counsel time and leeway to get up to speed on the case.'" (*Williams*, *supra*, 58 Cal.4th at p. 251.)

As the court aptly noted, "'The trial judge is the captain of the ship; and it goes without saying that the ship will go in circles if the crew is running around the deck with no firm marching orders.'" (*Williams*, *supra*, 58 Cal.4th at p. 251.)  The court concluded, "We do not find the trial court directly responsible for the delay in this case.  We caution, however, that trial courts must be vigilant in protecting the interests of the defendant, the prosecution, and the public in having a speedy trial." (*Ibid*.)  The *Williams* court cited the Montana Supreme Court's decision in *State v. Couture* (Mont. 2010) 240 P.3d 987 (*Couture*) approvingly, in which the court observed, "[T]he court cannot force [the defendant] to waive his right to be brought to trial promptly in order to exercise his right to prepare a defense." (240 P.3d at p. 1010, fn. 5.)  "And to that end, it is entirely appropriate for the court to set deadlines and to hold the parties strictly to those deadlines unless a continuance is justified by a concrete showing of good cause for the delay." (*Id*. at p. 1009; see *Orozco v. Superior Court* (2004) 117 Cal.App.4th 170, 179 (*Orozco*) [observing as to delay in bringing SVPA petition to trial, "[t]he trial court should not have acquiesced in the leisurely manner in which this matter was approached by the parties"].)

60

The Montana Supreme Court in *Couture* concluded the defendant's right to a speedy trial was not violated by a two-and-a-half-year delay in bringing his homicide case to trial where a substantial portion of the delay resulted from his attorney's requests for a continuance without a concrete showing of good cause. (*Couture, supra*, 240 P.3d at pp. 1003, 1014.) The court observed, "This case demonstrates, unfortunately, what happens when each participant in the criminal justice system fails to meet his or her respective obligations. Cases drag on endlessly from continuance to continuance; evidence and documents are lost; witnesses cannot be located; the accused sits in jail 'deteriorating' and becoming increasingly frustrated with counsel; and the prosecution and the defense adopt a 'stream of consciousness' approach, raising one issue and resolving that, then raising another and resolving that, followed by another, and then another. Meanwhile, the right to a speedy trial swings aimlessly in the breeze." (*Id.* at p. 1015.)

The court cautioned, "It is the obligation of the prosecutor and the court to try the accused in a timely manner, and this duty requires a good-faith, diligent effort to bring him to trial quickly. [Citation.] . . . And, most importantly, it is the obligation of the trial court to ensure that the prosecution and the defense fulfill their respective obligations." (*Couture, supra*, 240 P.3d at p. 1015.)

Here, by early 2015 it became clear the case was proceeding slowly because of dramatic staffing cuts in the public defender's office. While we have found this breakdown in the public defender system is attributed to the state, the trial court failed Vasquez as well. We recognize the challenge facing a well-intentioned trial court in seeking to move an SVPA petition to trial while protecting the individual's right to competent counsel.

However, the trial court should have considered whether to remove the public defender's office so that an attorney with adequate time to prepare the case could assume Vasquez's representation. Indeed, the trial court ultimately took this action, but not until almost two years had passed, when Vasquez spoke up and declared, "Enough is enough."

A deputy public defender may not continue to represent an indigent defendant where the attorney "is compelled by his or her excessive caseload to choose between the rights of the various indigent defendants he or she is representing." (*Edward S.*, *supra*, 173 Cal.App.4th at p. 414.) As the *Edward S.* court explained, "'When a public defender reels under a staggering workload, he [or she] should proceed to place the situation before the judge, who upon a satisfactory showing can relieve him [or her], and order the employment of private counsel [citation] at public expense. Such relief, of necessity, involves the constitutional injunction to afford a speedy trial to a defendant. Boards of supervisors face the choice of either funding the costs of assignment of private counsel and often, increasing the costs of feeding, housing and controlling a prisoner during postponement of trials; or making provision of funds, facilities and personnel for a public defender's office adequate for the demands placed upon it.'" (*Edward S.*, *supra*, 173 Cal.App.4th at p. 414, quoting *Ligda v. Superior Court* (1970) 5 Cal.App.3d 811, 827-828 (*Ligda*).)

Other states have adopted the *Edward S.* approach. (See e.g., *State ex rel. Missouri Public Defender Com. v. Waters* (Mo. 2012) 370 S.W.3d 592; *People v. Roberts* (Colo. Ct.App. 2013) 321 P.3d 581 (*Roberts*); see also *Public Defender v. State* (Fla. 2013) 115 So.3d 261, 270 ["'[W]hen understaffing creates a situation where indigent [defendants] are not afforded effective assistance of counsel, the public defender may be allowed to withdraw.'"].)

62

In *Waters*, the Missouri Supreme Court cited *Edward S.* for the proposition that there is a conflict of interest "'when a public defender is compelled by his or her excessive caseload to choose between the rights of the various indigent defendants he or she is representing.'" (*Waters*, at p. 608, quoting *Edward S., supra*, 173 Cal.App.4th at p. 414.) The court explained that in order to protect a defendant's Sixth Amendment right to counsel, "appointed counsel must be in a position to provide *effective* assistance." (*Waters*, at p. 608.)

Even if the public defender's office does not seek to withdraw as counsel, the trial court in limited circumstances may on its own motion remove appointed counsel if the attorney's excessive caseload prevents him or her from providing adequate representation. (See *People v. Mungia* (2008) 44 Cal.4th 1101, 1119-1125 [trial court did not abuse its discretion in removing public defender as counsel of record over defendant's objection where deputy public defenders were unable to bring defendant's case to trial within a reasonable amount of time]; *People v. Cole* (2004) 33 Cal.4th 1158, 1187 [same]; see also *People v. Daniels* (1991) 52 Cal.3d 815, 845-847 [trial court properly removed appointed counsel over defendant's objection based on a conflict of interest where the prosecutor intended to call that attorney as a witness at trial].)

As the Supreme Court held in *People v. Cole*, "Counsel may also be relieved on the trial court's own motion, over the objection of the defendant or his counsel, 'to eliminate potential conflicts, ensure adequate representation, or prevent substantial impairment of court proceedings.'" (*People v. Cole, supra*, 33 Cal.4th at p. 1187.) "The statutory source of the trial court's authority to disqualify an attorney derives from its power '[t]o control in furtherance of justice, the conduct of its ministerial

63

officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto.'" (*People v. Noriega* (2010) 48 Cal.4th 517, 524, quoting Code Civ. Proc., § 128, subd. (a)(5) [trial court had authority to disqualify public defender's office over defendant's objection based on conflict of interest that would arise at trial if prosecution called former client of public defender's office]; see *People v. Rodriguez* (2016) 1 Cal.5th 676, 682, quoting *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 967 ["'It is . . . well established that courts have fundamental inherent equity, supervisory, and administrative powers, as well as inherent power to control litigation before them. . . . That inherent power entitles trial courts to exercise reasonable control over all proceedings connected with pending litigation . . . in order to insure the orderly administration of justice.'"].)

Indeed, a court "has the *obligation* to ensure adequate representation of counsel, even to the extent of removing retained counsel, but 'only in the most flagrant circumstances of attorney misconduct or incompetence when all other judicial controls have failed.'" (*People v. Freeman* (2013) 220 Cal.App.4th 607, 610, italics added [Court of Appeal on its own motion removed defendant's appellate counsel where counsel filed four incomprehensible appellate briefs reflecting ineffective assistance of appellate counsel].)

Although a trial court must be cautious in taking the extraordinary step of relieving appointed counsel for a defendant over his or her objection, at a minimum, the trial court as of at least March 2015 should have inquired of Vasquez whether he wanted the court to appoint new counsel to bring his case more quickly to trial, or to continue to have Shenkman represent him, but at a slower pace. Depending on Vasquez's response, either

64

the trial court would have acted almost two years earlier to assign a bar panel attorney to move his case forward more expeditiously, or Vasquez could have waived his right to a speedy trial to allow Shenkman to continue to represent him.

We recognize we are reviewing the record with the benefit of hindsight. Indeed, the trial court might well have believed a delayed trial with Shenkman as counsel of record was a better option for Vasquez than replacing her with yet another attorney who would need time to prepare for trial. Nonetheless, the trial court had an obligation to act proactively to protect Vasquez's right to a timely trial, at least by having Shenkman and Vasquez address at a hearing whether Vasquez would best be served by appointment of new counsel.

We next consider what action the trial court should have taken in September 2016, when Shenkman advised the court that her office was transferring her to another unit, but that otherwise she would have been prepared for trial by the January 2017 trial date. We recognize the officeholder of the public defender, not the individual deputy, is the official attorney of record. (*People v. Jones* (2004) 33 Cal.4th 234, 237, fn. 1; *People v. Sapp* (2003) 31 Cal.4th 240, 256.) As the attorney of record, the public defender has the authority to assign specific deputies to cases, and to seek the office's removal from a case when appropriate. (*Sapp*, at p. 256 [trial court did not abuse its discretion in granting public defender's motion to withdraw as counsel for defendant over defendant's objection based on conflict of interest where assigned deputy public defender was unprepared for capital trial and public defender had serious concerns about deputy's competence].)

However, at least one court has held that a trial court has the power to order a specific deputy public defender to remain

assigned to a case over the public defender's objection. (See *Ligda, supra*, 5 Cal.App.3d at p. 826.)[27] In *Ligda*, the Court of Appeal upheld the trial court's order that a specific deputy public defender remain as advisory counsel to a defendant after the defendant's *Faretta* motion to represent himself was granted, despite the public defender's later objection. (*Id*. at pp. 819-820, 826.) The court observed, "While in particular instances the defendant has been represented in court at different stages of a prosecution by different attorneys from a public defender's office, the record revealing no prejudice to defendant [citation], it does not follow that a trial judge may not direct that one familiar with the cause continue with it in an advisory capacity to prevent the possibility of prejudice to the rights of a defendant [citation]." (*Id*. at p. 826.)[28]

We need not reach whether the trial court here could have properly ordered Shenkman to remain on Vasquez's case. At a minimum, the trial court should have used its inherent authority under Code of Civil Procedure section 128, subdivision (a)(5), "[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a

---

[27] A trial court also may similarly deny a nonindigent defendant's motion to discharge his or her retained attorney "if discharge will result in 'significant prejudice' to the defendant [citation], or if it is not timely, i.e., if it will result in 'disruption of the orderly processes of justice.'" (*People v. Ortiz* (1990) 51 Cal.3d 990, 983; accord, *People v. Lara* (2001) 86 Cal.App.4th 139, 153.)

[28] The court noted it would have been too late to assign a private attorney to provide legal assistance to the defendant at trial given that there were only 81 attorneys in the county, and at least 14 of them worked for the public defender's office or the district attorney. (*Ligda, supra*, 5 Cal.App.3d at p. 819.)

judicial proceeding before it" to order Shenkman's supervisor to appear in court to address whether transferring Shenkman four months before trial in a then 16-year-old case was necessary, and how it would impact Vasquez's constitutional right to a timely trial.[29] While we cannot know what would have happened had the trial court taken this step, the trial court's inquiry of a supervisor from the public defender's office could well have caused the office to keep Shenkman on the case for the four months necessary to bring Vasquez's case to trial, avoiding yet another year's delay. "The [court's] paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar." (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1145 [considering motion to disqualify opposing counsel].)

As in *Williams*, we do not find the trial court was "directly responsible for the delay in this case," but we caution that the trial courts "must be vigilant in protecting the interests of the defendant, the prosecution, and the public in having a speedy trial." (*Williams*, *supra*, 58 Cal.4th at p. 251.) As the "captain of the ship," the trial court cannot passively preside over a case as it moves forward at a snail's pace without a trial date in sight. In the end, Vasquez may have had competent counsel, but at the expense of a timely trial. He had a right to both.

---

[29] The trial court would need to consider whether to conduct this inquiry in camera given the sensitive nature of the issues involved. (See, e.g., *People v. Lopez* (2008) 168 Cal.App.4th 801, 815 ["the better practice" is to hold a *Marsden* hearing in camera].)

E.    *Application of the* Mathews *Due Process Factors*

The *Mathews* balancing test compels the same result.  As the court in *Litmon* concluded with respect to the first factor, """commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."""" (*Litmon*, *supra*, 162 Cal.App.4th at p. 400.)  Here, Vasquez's confinement for 17 years awaiting trial caused a significant deprivation of liberty.  As to the second factor, given Vasquez's lengthy commitment, there was a "risk of an erroneous deprivation of [Vasquez's liberty] interest." (*Mathews*, *supra*, 424 U.S. at p. 335; see *Litmon*, at p. 400.)  Although Vasquez had 23 positive evaluations, the outcome of a jury trial was not certain, especially given his commencement of treatment in the sex offender treatment program starting in September 2015, and later Dr. Korpi's negative evaluation.  Moreover, as the trial court found, even if Vasquez had been committed after a trial, he was facing only a two-year commitment, and the People would have needed to file successive petitions to continue his commitment, at least until the law provided for an indeterminate term of commitment, effective in 2007.  (See § 6604; *Landau*, *supra*, 214 Cal.App.4th at p. 28, fn. 9.)  Instead, Vasquez was detained on the original petition for 17 years.

Similarly, as to the third factor, as the court in *Litmon* concluded, "[T]he state has no interest in the involuntary civil confinement of persons who have no mental disorder or who are not dangerous to themselves or others." (*Litmon*, *supra*, 162 Cal.App.4th at p. 401.)  Further, as the trial court here found, "[t]he burden in going to trial in year two as opposed to going to trial in year 17 involves no additional administrative or fiscal burdens."  This is in contrast to *Mathews*, in which the court held the government had an interest in delaying an evidentiary

68

hearing on denial of a recipient's disability benefits until the final termination of benefits. (*Mathews*, *supra*, 424 U.S. at pp. 347-349.)

Accordingly, the trial court did not err in concluding that under the *Mathews* test, "Vasquez has been denied due process." (See *People v. Jones*, *supra*, 57 Cal.4th at p. 922; *People v. Lazarus*, *supra*, 238 Cal.App.4th at p. 757.)

F.     *The Trial Court Did Not Err in Dismissing the SVPA Petition To Remedy Deprivation of Vasquez's Right to Due Process*

The People contend the proper remedy for the delay in bringing Vasquez's case to trial was to issue "an order directing that the matter proceed to trial forthwith," citing the Court of Appeal's opinion in *Orozco, supra*, 117 Cal.App.4th 170. However, as the Supreme Court in *Williams* made clear, "'[t]he amorphous quality of the right [to a speedy trial] also leads to the unsatisfactorily severe remedy of dismissal of the indictment when the right has been deprived. . . . Such a remedy is more serious than an exclusionary rule or a reversal for a new trial, but it is the only possible remedy.'" (*Williams*, *supra*, 58 Cal.4th at p. 233, quoting *Barker*, *supra*, 407 U.S. at p. 522.) In the context of an SVPA petition, the court in *Litmon* similarly held, after concluding that Litmon had been denied due process by the delay in bringing his case to trial, "The [trial] court should have granted [Litmon's] January 2007 motion to dismiss the consolidated petitions." (*Litmon*, *supra*, 162 Cal.App.4th at p. 406.)

The holding in *Orozco* is not to the contrary. In *Orozco*, Hernan Orozco had moved to dismiss the People's SVPA recommitment petitions on the basis that his second

69

recommitment petition was not brought to trial before the expiration of the first recommitment petition. (*Orozco, supra*, 117 Cal.App.4th at p. 175.) The Court of Appeal concluded that the SVPA only required that the recommitment petition be *filed* before the expiration of the underlying commitment term: "The statutory scheme does not require that the recommitment *order* be obtained before the expiration of the underlying term." (*Orozco*, at p. 179.)

The court then considered "whether the delay in trial violated Orozco's right to due process." (*Orozco, supra*, 117 Cal.App.4th at p. 179.) Notably, the court did not find a due process violation, instead finding the motion to dismiss "was meritless" because the delay in trial was attributable to Orozco's counsel or Orozco, and that Orozco had waived the delay. (*Ibid*.) The court explained that under former section 6602, a "trial on a recommitment petition should occur within a reasonable time after the probable cause hearing." (*Orozco*, at p. 179.) It was in this context that the court stated that "[t]he remedy for the delay is not dismissal but rather, an order directing that the matter proceed to trial forthwith." (*Ibid*.)

Here, in light of the violation of Vasquez's Fourteenth Amendment due process right to a timely trial, under *Barker*, *Williams*, and *Litmon*, the proper remedy was dismissal of the petition. Accordingly, the trial court did not err in granting the motion to dismiss.[30] (See *People v. Jones, supra*, 57 Cal.4th at p. 922; *People v. Lazarus, supra*, 238 Cal.App.4th at p. 757.)

---

[30] While dismissal is a "'severe remedy,'" as the court in *Williams* explained, "'it is the only possible remedy.'" (*Williams, supra*, 58 Cal.4th at p. 233.) Further, as the court in *Litmon* observed, its "conclusion, of course, does not preclude other civil commitment proceedings against [Litmon] if appropriate.

# DISPOSITION

The petition is denied.  The stay of the proceedings is lifted.

FEUER, J.

WE CONCUR:


PERLUSS, P. J.


ZELON, J.

---

[Litmon] might still be involuntarily committed and treated under the [Lanterman–Petris–Short] Act."  (§ 5000 et seq.)."  (*Litmon, supra*, 162 Cal.App.4th at p. 406.)  The Lanterman–Petris–Short Act provides for confinement of "an imminently dangerous person" for specified time periods.  (*Litmon*, at p. 402, fn. 5; see § 5000 et seq.)