Filed 1/21/22  P. v. Eden CA1/4

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>SCOTT DEAN EDEN,<br><br>        Defendant and Appellant. | A162818<br><br>(Humboldt County<br>Super. Ct. No. CR026107S) |

Defendant Scott Dean Eden appeals a judgment adjudicating him to be a sexually violent predator (SVP), pursuant to the Sexually Violent Predator Act (SVPA or Act) (Welf. & Inst. Code, § 6600 et seq.). He contends there is insufficient evidence to support the jury's finding that he is likely to commit a violent predatory sexual offense if released. He also asserts that prejudicial delays in bringing the matter to trial violated his right to due process. We find no prejudicial error and affirm the judgment.

## Background

On July 11, 2016, the People filed a petition seeking to commit defendant as a SVP. On February 3, 2017, the court found probable cause to believe that defendant was a SVP and ordered him held for trial. The matter was originally set for trial on May 8, 2017, but continued for reasons discussed below until May 17, 2021.

1

At trial, the following evidence was presented regarding defendant's prior qualifying convictions:

In 1990, defendant pled guilty to kidnapping (Pen. Code, § 207, subd. (a)) and assault with intent to commit rape, with an attached personal-use-of-a-firearm allegation (Pen. Code, §§ 220, 12022.5), and was sentenced to five years in prison. Evidence established the following factual basis for the crimes: Defendant approached the victim in a parking lot as she was loading groceries into her car and used a gun to force her to drive him out of the parking lot. He told her, "I'm going to rape you, and if you don't do what I say, I'll shoot you, nobody will ever see you again." He forced her to go to another location and park the car, where he fondled her breasts and touched her between her legs. After a few minutes, he told the victim to get out of the car so that he could rape her. When he exited the car before her, however, the victim quickly drove away.

In 2003, defendant pled guilty to two counts of spousal rape (Pen. Code, § 262, subd. (a)(1)), and one count of forcible sexual penetration (Pen. Code, § 289, subd. (a)(1)) and was sentenced to 16 years in prison. Evidence established the following factual basis for the crimes: In December 2002, defendant's wife reported to the police that defendant had raped her approximately 150 times over the course of their five-year marriage and that he had once forced a flashlight into her vagina. Defendant admitted all the allegations and indicated that he has a "sexual problem that requires help."

Two experts opined that defendant met the requirements for commitment as a SVP. Clinical and forensic psychologist, Dr. Bruce Yanofsky, testified that he was assigned to evaluate defendant in 2016, but defendant refused to meet with him at that time. Based on the available records, Yanofsky diagnosed defendant with Other Specific Paraphilic

2

Disorder (Non-Consent). In 2017, defendant agreed to an interview with Dr. Yanofsky. During the interview, defendant claimed not to really remember the kidnapping and assault of his first victim, but confirmed that he routinely raped his wife. Defendant "talked about not being able to control his urges when it came to his wife and how, despite having access to normal consensual sex, he still engaged in this forceful sexual activity." Yanofsky interviewed defendant again in 2019. Again, defendant "did not deny the essence of the offenses or the behaviors or the fact that he had not been able to control his behavior." Yanofsky maintained his previous diagnosis, while adding that defendant had "Borderline Intellectual Functioning," which is not itself a diagnosis but is "a clinical condition that merits attention." Yanofsky was unable to interview defendant in 2020 or 2021, but he confirmed his diagnosis based on his review of additional materials. As of trial, Yanofsky "continue[d] to believe that [defendant] suffers from Other Specified Paraphilic Disorder (Non-Consent), and [that] the Borderline Intellectual Functioning is likely present as well." Yanofsky explained that because of defendant's diagnosis "there is a sustained pattern of interest in forcing females into sexual activity which is arousing to him and has led to his offense behavior." His mental health disorder, particularly his inability to control himself, "predisposes him to commit sexual crimes in the future." Yanofsky used several actuarial tools, including the STATIC-99R, to determine that defendant was at an "above-average" risk of reoffending. Based on the interviews with defendant, his medical and psychiatric records, and the actuarial tools, Yanofsky believed that due to his mental disorder defendant "poses a well-found risk for sexual offenses" and he is likely to engage in predatory, sexually violent criminal behavior.

Clinical and forensic psychologist Dr. Christopher Matosich testified that he evaluated defendant five times between 2016 and 2021. Those evaluations were based on Matosich's review of pertinent records and face-to-face interviews with defendant in 2017 and 2019. Matosich also diagnosed defendant with Other Specified Paraphilic Disorder (Non-Consent). Matosich used the same actuarial tools as Yanofsky to analyze the risk that defendant would engage in future sexually violent criminal behavior and obtained the same results. Relying on all this information, Matosich concluded that defendant is likely to commit predatory, sexually violent criminal behavior in the future.

Defense expert Dr. Brian Abbott, a licensed clinical psychologist, questioned the testimony by the prosecution's experts and opined that risk of recidivism, as measured by the tools they used, was considerably smaller than testified to by those experts. He also disagreed with the other experts' diagnosis of defendant and their testimony that sex offender treatment would alleviate defendant's condition and reduce risk. Based on his review of defendant's medical records, scores on the STATIC-99R and age,[1] Abbott opined that defendant "is not a substantial danger in that he's not a serious and well-founded risk to engage in sexually-violent-predatory acts."

The jury found the allegations of the petition to be true, and that defendant met the criteria for certification as a SVP. Defendant was ordered committed to the Department of State Hospitals and timely filed a notice of appeal.

---

[1] Defendant was 51 years old at the time of trial.

**Discussion**

1. **Substantial evidence supports the finding that defendant is likely to engage in sexually violent predatory criminal behavior in the future.**

To be committed as an SVP, the People must prove beyond a reasonable doubt that "(1) [the defendant] ha[s] been convicted of at least one qualifying sexually violent offense, (2) he has a diagnosed mental disorder that makes him a danger to the health and safety of others, and (3) his diagnosed mental disorder makes it likely he will engage in sexually violent criminal behavior in the future." (*People v. Orey* (2021) 63 Cal.App.5th 529, 561; § 6600, subd. (a)(1).) "[A] person is 'likely [to] engage in sexually violent criminal behavior' if at trial the person is found to present a substantial danger, that is, a serious and well-founded risk, of committing such crimes if released from custody." (*People v. Roberge* (2003) 29 Cal.4th 979, 988, quoting § 6600, subd. (a).) In addition, there is an "implied requirement" that they are "likely to commit sexually violent *predatory* criminal acts" in the future. (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1186.) A predatory act is one directed " 'toward a stranger, a person of casual acquaintance with whom no substantial relationship exists, or an individual with whom a relationship has been established or promoted for the primary purpose of victimization.' " (*Id.* at p. 1188, quoting § 6600, subd. (e).)

Defendant contends "the evidence adduced at trial was insufficient, as a matter of law, to support a finding that [he] was likely to commit future sexual offenses of a predatory nature, as required for commitment as an SVP." He acknowledges that "evidence arguably existed to support a jury finding as to the enumerated factors under the SVP statute, i.e. [his] prior offenses, mental disorder, and dangerousness" but argues that "there was insufficient evidence to support a finding beyond a reasonable doubt with

5

respect to the <u>additional</u> requirement that [his] future sex offenses were likely to be predatory in nature." He concedes that "both of the People's retained experts, Yanofsky and Matosich, testified that they believed that [defendant] was likely to commit future sex offenses and that such offenses were likely to be predatory in character" but argues that the experts' reliance on a single incident occurring over 30 years ago was insufficient to establish a *current* propensity to commit predatory acts.

We review "the sufficiency of the evidence in SVPA cases under the same substantial evidence test used in criminal appeals. [Citation.] 'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] Reversal for insufficiency of the evidence is warranted only if it appears that ' "upon no hypothesis whatever is there sufficient substantial evidence to support [the judgment]." ' " (*People v. Orey*, *supra*, 63 Cal.App.5th at pp. 560-561.)

Initially, we disagree with defendant's assertion that there is "no logical reason why a <u>single</u> offense, committed over <u>thirty years ago</u>, is in any way probative of the issue of [defendant's] <u>present</u> likelihood of reoffending in a predatory manner if released." The fact that he has not reoffended in a "predatory" manner since 1989 is explained in large part by his incarceration for approximately 24 years since his conviction in 1990. (See *People v. Hoffman* (2021) 61 Cal.App.5th 976, 978 [fact that defendant has not reoffended for 30 years was product of his being "imprisoned and/or deprived of his freedom by civil commitment for 30 years" not an indication that he

6

posed no risk].) And, while the offenses were not necessarily predatory, he began reoffending shortly after his discharge from parole in 1997. [2]

Moreover, the prosecution's experts did not rely solely on the single offense committed 30 years ago in support of their opinions. Yanofsky testified that his opinions were based on his review of the records, the actuarial tools he used, and his interviews with defendant. When asked specifically if the STATIC-99 differentiated risk based on the potential for violent versus predatory offenses, Yanofsky explained, "I would say most offenses against adults, if not all of them, include violence, so they are violent. The predatory nature of it are going to be perhaps defined or looked at from the items on the STATIC-99. So, for example, if you look at the stranger-victim question, then you would be looking at anyone who has committed a crime against a stranger is by essence predatory. And you could probably find the data associated with that, which we know increases the risk. [¶] So someone who committed an offense that is predatory is going to code higher on the STATIC-99." Matosich also indicated that in addition to the fact of defendant's prior offense, he relied on the actuarial tools as well as the nature of defendant's mental health disorder in concluding that defendant is likely to reoffend in a sexually violent predatory manner. Like Yanofsky, he explained, "The STATIC-99R, one of the factors that had been demonstrated to be significantly correlated with risk of sexual recidivism is having a stranger victim. Mr. Eden scored on that item, and with that his risk was increased supporting the likelihood of sexual recidivism. It would be

---

[2] In his written evaluation of defendant, Yanofsky observed that "it is not known if [defendant] maintained or established the relationship with his wife for the purpose of victimization which would also be considered predatory."

substantial and well-founded and serious." Defendant's argument to the contrary relies on an overly restrictive reading of the experts' testimony.[3]

Similarly, nothing in the record supports defendant's additional assertions that the experts gave undue weight to the prior incident and ignored other relevant factors such as defendant's current age. Both experts acknowledged the effect of age on risk of recidivism, but as Yanofsky testified, the factor is addressing "whether the person is either really of advanced age, very sick, and their life expectancy is such that they're not expected to live very long [or] [t]hey're incapable of physically doing the offending."

Finally, the fact that defendant's subsequent offenses were committed against his wife and not a stranger does not preclude a finding that he is likely to reoffend in a predatory nature if released. The unrestrained impulses that led him to commit such offenses against his wife may well render it likely that he will commit such offenses against others when he no longer has access to his wife. As noted above, defendant reoffended almost

---

[3] Defendant notes that when Yanofsky was asked whether defendant was likely to engage in sexually violent predatory criminal behavior, he testified as follows: "Yes. His previous offending was predatory in nature, particularly the first offense committed against a total stranger was in the direct essence of the definition of predatory. So I do believe that if he does reoffend, it is likely to be in that manner again." Defendant similarly notes that when Matosich was asked about the issue, he responded as follows: "I found that the aspect of predatory that is met for the SVP regarding Mr. Eden is victim-stranger. That was the first victim. And that I found that if there were future sex offenses of this nature, they would be of a similar manner. It would unfold — it would unfold in a similar manner as involving a stranger." As set forth above, the experts' testimony on this topic was more expansive than a single question and must be read as a whole.

immediately upon his discharge from parole and was precluded from committing further offenses, predatory or otherwise, by his incarceration.[4]

2. **The five-year delay in bringing the petition to trial did not violate defendant's right to due process**.

Under section 6601.5 of the Act, after a petition for civil commitment is filed, the trial court must "review the petition and determine whether the petition states or contains sufficient facts that, if true, would constitute probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release." If the court finds that the petition is facially sufficient, it must hold a probable cause hearing within 10 days. (*Ibid*.) The probable cause hearing may be continued upon a showing of good cause. (§ 6602, subd. (b).) If probable cause is found, the subject of the petition is entitled to a trial. (§§ 6603, subd. (a), 6604.) An individual found to be an SVP at trial can be committed indefinitely for confinement and appropriate treatment in a state hospital. (§ 6604.)

---

[4] In an analogous context, in *In re Lawrence* (2008) 44 Cal.4th 1181, 1191, the California Supreme Court has held that where "evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is *overwhelming*, the *only* evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' inevitably supporting the ultimate decision that the inmate remains a threat to public safety." (Italics added.) Defendant has not argued that a similar limiting principle should be applied in this context. Nor would the record support its application here as defendant has not yet participated in a sexual offender treatment program and the experts' opinion is based on more than just the prior predatory offense.

" 'The SVPA does not establish a deadline by which a trial on an SVP petition must be held after the trial court finds probable cause to believe the inmate is an SVP.' [Citation.] Further, because it is a civil proceeding—not a criminal prosecution—the Sixth Amendment right to a speedy trial does not apply. [Citation.] Nevertheless, '[b]ecause civil commitment involves a significant deprivation of liberty, a defendant in an SVP proceeding is entitled to due process protections.' [Citation.] This includes the due process right to a timely trial." (*People v. Tran* (2021) 62 Cal.App.5th 330, 347 (*Tran*).)

Here, in May 2021, defendant filed a motion seeking to dismiss the petition based on a violation of his right to due process. He argued that the almost five year delay in bringing the petition to trial was unreasonable and prejudicial. The trial court disagreed, and denied the motion.

We review defendant's due process claim de novo, applying the tests articulated in *Barker v. Wingo* (1972) 407 U.S. 514 (*Barker*) and *Mathews v. Eldridge* (1976) 424 U.S. 319 (*Mathews*). (See also *Tran, supra*, 62 Cal.App.5th at p. 346, 347-348.) Under *Barker, supra*, at page 514, this court considers four nonexhaustive factors to determine whether the right to a speedy trial has been violated: (1) the length of the delay; (2) who is to blame for the delay; (3) the defendant's assertion of the right; and (4) prejudice. (*Tran, supra,* at p. 348.) "None of these factors is 'a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. . . . [T]hese factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process.' " (*Ibid.*) Under *Mathews, supra*, at page 335 this court must balance these three factors: "(1) the private interest affected by the government

10

action; (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards'; and (3) the government's interest." (*Tran, supra,* at p. 348.) "Like the *Barker* test, the *Mathews* test 'involve[s] careful balancing of the competing interests.'" (*Ibid.*)

The petition in this case was filed in July 2016. Following a probable cause finding in February 2017, trial was set for May 2017. The trial was continued several times and did not commence until January 2020. According to defendant's motion to dismiss, although the early continuances were requested by the public defender's office, the delay was not defendant's fault. Counsel explained that most of the staff in the Humboldt County Public Defender's Office resigned by late-2017, leaving defendant without an attorney until he was assigned to the case in July 2019. The case was continued until January 2020 to give the attorney an opportunity to familiarize himself with the case and prepare for trial.

The trial that commenced in January 2020 resulted in a mistrial after the prosecution discovered evidence in a sheriff's file that had not previously been disclosed. The evidence was a 1989 letter from defendant's first victim that described defendant's abduction and sexual assault of her. The letter changed the opinion of one of the experts defendant intended to call at trial, which ultimately led to the mistrial. Apparently defendant unsuccessfully moved to dismiss the petition based on a violation of his due process rights after the mistrial was declared in January 2020.

Due to Covid-19 impacts on the court, the new trial that was initially set for June 2020 was continued several times to January 2021. In January, the court continued the trial for the last time to May 17, 2021.

While the delay in this case is considerable, it is not as long as the extraordinary delays in some SVP cases. (See *People v. Tran, supra*, 62 Cal.App.5th at p. 353 [nearly 11-year delay "weigh[s] in defendant's favor"]; *In re Butler* (2020) 55 Cal.App.5th 614, 648 ["it would be difficult to argue that the [13-year] delay . . . was anything other than extraordinary"]; *People v. DeCasas* (2020) 54 Cal.App.5th 785, 806 [13-year delay was "extraordinary"]; *People v. Superior Court (Vasquez)* (2018) 27 Cal.App.5th 36, 61 (*Vasquez*) [17-year delay was "extraordinary"].)

No party bears full responsibility for the delays. Neither defendant nor the People are responsible for the "systemic breakdown" in the public defender's office that purportedly led to the first significant delay. The majority of the continuances during this period were made at the request of defendant's counsel. In *Vasquez*, the court recognized that " '[t]he general rule attributing to the defendant delay caused by assigned counsel is not absolute. Delay resulting from a systemic "breakdown in the public defender system," [citation], could be charged to the State.' " (*Vasquez, supra*, 27 Cal.App.5th at p. 66, quoting *Vermont v. Brillon* (2009) 556 U.S. 81, 94.) Here, the record is sparse regarding the circumstances in the public defender's office during this time period. We cannot charge defendant for these delays, but at the same time, given the prosecutor's repeated objections to the continuances, the People cannot be held responsible. (See *Vasquez, supra*, at p. 64 [prosecution is not responsible for delay where the deputy district attorney repeatedly objected to continuance of the trial date].)

The People do bear responsibility for the six-month delay caused by the mistrial. As defendant notes, "although there was no indication that the prosecution was aware of or participated in the late disclosure, it cannot

12

escape responsibility for the failure of the sheriff's department, which is also an agency of the People."

As with many cases in the last year, no party bears responsibility for the impacts of Covid-19 on the court system. On at least one occasion defendant objected to the continuance but continued to assert his right to an in-person trial, which was not possible under then-existing restrictions.

Because defendant twice moved to dismiss the trial based on unreasonable delay, the assertion of his rights weighs in his favor.

Without minimizing the "anxiety and concern" suffered by defendant during his pretrial incarceration, apparently without significant treatment, defendant has failed to establish that he " 'suffered the "most serious" type of prejudice'—that is, 'the inability to adequately prepare his defense.' " (*Tran*, *supra*, 62 Cal.App.5th at p. 353.) Defendant suggests that his defense was impaired but fails to explain why this is so. Defendant was prepared to go to trial in January 2020 with two experts. Despite the delay of almost a year and a half, defendant did not replace the expert who changed her mind and continued to trial with only Dr. Abbott. There is no suggestion that memories faded or the opinions offered by the experts were stale, different from what they would have expressed at an earlier trial, or of different persuasiveness because of the delay. In fact, defendant's increased age of five years may have strengthened his contention that he was not likely to re-offend.

In short, the *Barker* factors reflect mixed responsibility for a moderate albeit unfortunate delay, but the absence of any substantial prejudice to the defendant. On balance, under the *Barker* criteria defendant's due process right to a timely trial was not violated.

The same result is reached applying the *Matthews* test. While defendant's liberty was curtailed during his pretrial detention for almost five

13

years, as explained in *Tran, supra,* 62 Cal.App.5th at page 355, the remaining *Matthews* factors outweigh the deprivation of liberty for this period of time. "Any risk of an erroneous deprivation was mitigated by the procedural safeguards required by the SVPA. . . . Defendant received a probable cause hearing and, throughout the life of the case, he was reevaluated numerous times to assess whether he still met the SVP criteria." (*Ibid.*) Similarly, "[t]here is no question that 'the state has a compelling protective interest in the confinement and treatment of persons who have already been convicted of violent sex offenses, and who, as the result of current mental disorders that make it difficult or impossible to control their violent sexual impulses, represent a substantial danger of committing similar new crimes.' " (*Ibid.*)

Accordingly, we must affirm the order of commitment.

## Disposition

The judgment is affirmed.


POLLAK, P. J.


WE CONCUR:

STREETER, J.
DESAUTELS, J.[*]

---

[*] Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14